No. 12386

IN THE SUPREME COURT OF THE STATE OF MONTANA

1973

---

STATE ex rel JAMES R. HOWETH,

Plaintiff and Appellant,

-vs-

D. A. DAVIDSON & CO., a Montana
Corporation; and IAN B. DAVIDSON and
LEON WEAR;

Defendants and Respondents.

---

Appeal from: District Court of the Eighth Judicial District,
Honorable R. J. Nelson, Judge presiding.

Counsel of Record:

For Appellant:

Loble, Picotte and Loble, Helena, Montana
Gene Picotte argued, Helena, Montana

For Respondents:

Church, Harris, Johnson and Williams, Great Falls,
Montana
Charles C. Lovell and Richard F. Gallagher argued,
Great Falls, Montana

---

Submitted: September 24, 1973

Decided: DEC 26 1973

Filed: DEC 26 1973

Thomas J. Kearney
Clerk

Mr Justice Frank I. Haswell delivered the Opinion of the Court.

This action began as a mandamus action filed by James R. Howeth, who claimed to be a stockholder in defendant D. A. Davidson & Company, to secure access to financial and other records of the company. The application for writ was filed in Lewis and Clark County against D. A. Davidson & Company, Ian B. Davidson, as president, and Leon Wear, as secretary and custodian of the corporate records. Venue was changed by stipulation to Cascade County. Defendants counterclaimed, demanding specific performance of a buy-back agreement covering plaintiff's stock and seeking equitable relief. At the time set for trial, plaintiff dismissed his petition, interposed additional affirmative defenses to the counterclaim, and immediately thereafter, the counterclaim and defenses came on for trial before the Hon. R. J. Nelson, sitting without a jury, in the district court of Cascade County. The court granted defendant specific performance of the stock buy-back agreement. From this judgment, plaintiff appeals.

D. A. Davidson & Company is a closely held corporation, conducting a stock brokerage business in Montana. Howeth was an employee of Davidson Company from 1959 until September 30, 1970. He was employed as a stock salesman, manager of Davidson's Helena branch office, and he became a vice president and director of the company in 1964 and 1969, respectively.

In 1965 Howeth and the Davidson Company entered into a written agreement whereby Howeth would purchase 60 shares of treasury stock held by the corporation. Howeth tendered $15,000 for these shares, representing approximately 50% of book value. As part of this agreement the corporation retained an option to repurchase the stock within 90 days in the event Howeth's employment was terminated for any reason. The agreement provides that if said event should occur " * * * the purchase price shall

be fifty percent (50%) of the book value, or the cost basis of the SECOND PARTY in the stock, whichever is greater (this price may be increased upon a majority vote of the Board of Directors of the CORPORATION, but not to exceed one hundred percent (100%) of book value.)"

Sixty shares of stock evidenced by Stock Certificate #16 was issued to Howeth pursuant to this agreement. At the time of issuance the stock certificate contained the following language written on the reverse side:

> "The holder of this certificate has a written agreement with the Pacific Coast Stock Exchange, dated January 22, 1965, which states 'that so long as the corporation is a member of the exchange no stock in the corporation shall be transferred, sold, assigned, pledged or otherwise encumbered or disposed of without the prior written consent of such exchange.'"

On September 30, 1970, Ian Davidson, president of the Davidson Company, personally delivered a letter written by himself to Howeth. The letter informed Howeth that as of this day his employment with the Davidson Company was terminated.

Over the course of the next three months the Davidson Company was conducting negotiations with Howeth for the repurchase of his stock. On December 2, 1970, Ian Davidson wrote Howeth to advise him:

> " * * * pursuant to a corporate resolution passed on the 30th day of November, 1970, at a special meeting of the Board of Directors of D. A. Davidson & Co. the corporation has elected to exercise its option to purchase your stock in the corporation."

Upon unanimous vote of the board of directors present, Ian B. Davidson, David S. Davidson, and William S. MacFadden, (representing 335 of the 440 shares outstanding) it was decided to purchase the stock at 50% of book value as provided in the agreement discussed above.

The repurchase price of Howeth's stock was set at $43,473.30.

This amount was computed by Howard Gaare, a certified public accountant.

The district court found that when Davidson Company initiated the repurchase of Howeth's stock, it was discovered that Howeth had borrowed monies from the Union Bank and Trust Company, Helena, Montana, had delivered certificate #16 to said bank, had executed a stock power to said bank, and that the Union Bank claimed a security interest in certificate #16 as collateral for the loan to Howeth. This was done without the knowledge or consent of either the Davidson Company or the Pacific Coast Stock Exchange in violation of his agreement with the Davidson Company, and in violation of exchange rules.

Howeth had also borrowed monies from the First National Bank, Helena, Montana and had given written instructions to the Davidson Company in a letter of May 1, 1967, to pay said bank from the proceeds of any sale of stock certificate #16.

Robert Burke, president of the First National Bank testified Howeth had told him on October 12, 1970 that he was going to sell his stock to the Davidson Company and that the $12,800 he owed to First National Bank would be paid by the Davidson Company from the sale proceeds. Burke confirmed this understanding of the conversation with Howeth by his letter of October 13, 1970 which was received by Howeth and Davidson.

To remove any encumbrances upon the stock the Davidson Company caused its attorneys to prepare a written consent to the payment terms with the December 2, 1970 letter. The consent provided that Davidson would repurchase the stock for $43,473.30, payable as follows:

(a) $8,357.00, plus interest, to Union Bank and Trust Company.

(b) $12,800.00, plus interest, to First National Bank.

(c)   The difference between the total of (a) and (b) above and $23,473.30 to Howeth, on or before December 31, 1970.

(d)   Remainder of $20,000.00 by Davidson's promissory note payable to Howeth, on or before January 15, 1971.

Howeth did receive the December 2, 1970 letter but did not sign and return the consent.  He did, however, keep and retain the $20,000 promissory note dated November 30, 1970, executed by Ian Davidson, and said note is still in Howeth's possession.

Ian Davidson called Howeth on or about December 10, 1970, to inquire why he had not yet returned the consent forwarded to him with the letter of December 2, 1970.  Howeth replied that he was concerned about the income tax consequences of the stock repurchase.

In order to minimize Howeth's income taxes on the $28,473.30 capital gain the payment terms were revised as follows:

(a)   $8,357.00, plus interest, to the Union Bank and Trust Company.

(b)   The difference between (a) above and $13,000.00 to Howeth on or before December 31, 1970.

(c)   $12,800 principal and $531.20 interest (total of $13,331.20) to the First National Bank on January 5, 1971.

(d)   The remaining balance of $17,142.10 to Howeth on January 15, 1972.

Davidson again caused its attorneys to prepare a written consent to the above payment terms and a promissory note, and mailed these to Howeth with its letter of December 15, 1970. Howeth received the letter and enclosures but did not sign and return the consent.  Howeth did, however, keep and retain the $17,142.10 promissory note dated November 30, 1970 which was signed by Ian Davidson.

Ian Davidson called Howeth on December 21, 1970 and inquired about the papers sent Howeth on December 15. Davidson testified that Howeth reaffirmed his agreement to accept payment and again promised to sign and mail the consent to Davidson. At the time of that telephone conversation, Ian Davidson made a note of the conversation in the upper right hand corner of the file copy of the December 15 letter which reads:

```
"656-6322
called 12-21-70
he said okay wld
send papers back
IBD"
```

Howeth, however, did not sign and return the consent papers. In fact he has denied that he ever agreed to accept the purported offer by oral telephone conversation. Howeth testified that he found the letters "surprising" and "somewhat maddening" because they seemed to assume that he had agreed to Davidson's propositions when in fact he had not.

Ian Davidson realizing that Howeth's written consent was not forthcoming and the 90 day option period at its end, sent Howeth another check. The check was in the amount of $12,500 representing the minimum payment the corporation was required to tender as a down payment to exercise its option. This letter and tender of payment for the repurchase of the stock was dated December 30, 1970, 91 days after the event specified by the option, i.e. Howeth's termination as an employee.

The annual meeting of Davidson and Co. was held on February 13, 1971. Howeth received notice of that meeting. Howeth was not re-elected as a director. At that meeting all the acts of the officers and directors of the corporation were approved, ratified and adopted, including the action by Ian Davidson and the executive committee on November 30, 1970, in discharging Howeth as officer and director of the corporation, effective

September 30, 1970.

From the foregoing findings of fact the district court concluded that the option for repurchase was timely exercised by Davidson Company, resulting in a contract by the terms of which Howeth is required to sell Davidson Company, certificate #16 for $43,473.30. And further that Howeth, by his actions, is estopped to deny that Davidson properly exercised the option. Howeth appeals from this judgment.

The fundamental issue in this appeal is the sufficiency of the evidence to support the judgment. Three issues underlie this determination:

(1) Whether the option of the Davidson Company to purchase Howeth's stock was properly exercised within the time specified in the option?

(2) Whether the district court's judgment of specific performance constitutes a harsh forfeiture which equity ought not to enforce?

(3) Whether the telephone conversations during the month of December, 1970, and all other alleged verbal communications between Ian Davidson and Howeth violate the parol evidence rule?

At the outset, we observe that plaintiff lists numerous findings of the district court that he contends are not supported by the evidence. We have examined these findings and the evidence supporting each and conclude that with one exception the material findings are supported by substantial, credible evidence. This exception relates to the finding that Howeth resigned as officer and director of the Davidson Company on September 30; this finding is not material, however, in view of the application of the doctrines of ratification, waiver and estoppel discussed later in this opinion.

Howeth's primary contention on the first issue is that as

a director of the Davidson Company he was entitled to notice of the board of directors' meeting of November 30, 1970. It was at that special meeting that the corporation passed a resolution to exercise its option to repurchase his stock. Howeth claims that the actions at said meeting were void because notice was not given.

The Davidson Company, on the other hand, contends that even if notice was not properly given the action of the directors' meeting to repurchase the stock was merely voidable and that Howeth's subsequent actions constitute a ratification of the corporate resolution. By encumbering the stock, by requesting payment on different terms than contained in the agreement, by never objecting to the tender, and by never objecting to not receiving notice he led the corporation to believe that it had properly exercised its option. Therefore, Howeth should be estopped to deny the validity of the corporate resolution. In the alternative the Davidson Company claims that Howeth was disqualified from voting by his personal interest. Thus the directors' meeting is not illegal because no notice to an interested director is required.

As a general rule notice of special meetings must be given the directors, so that each one may be afforded an opportunity to participate and vote. Section 15-2239, R.C.M. 1947. Under this rule, such notice to all directors is essential to the power of the board to do any deliberate act which shall bind the corporation.

When a number of directors are elected to manage the affairs of the corporation, it is contemplated that the corporation shall have the benefit of the judgment, counsel and influence of all. In the absence of special circumstances or express provisions to the contrary, every one of them should have an

opportunity to be present and take part in the deliberations of the board and attempt to convince the other members even if he represents a minority view. The great weight of authority, therefore, is to the effect that notice of a special meeting must be given to every director, unless there is some express provision in the charter or bylaws or established usage to the contrary. 2 Fletcher Cyc. Corp. §406.

There is also authority to the effect that such action by the board of directors is valid, although proper notice not given, if all directors are present or the absent directors waive notice, or if the acts done at the meeting are ratified by the absent directors, or at a subsequent meeting at which all directors have legal notice. 19 C.J.S. Corporations §747, p. 88, 89. Also a directors' meeting is not illegal, or the action thereat invalid, because of failure to give notice to a director who would have been disqualified from taking part by reason of personal interest. 19 Am Jur 2d, Corporations §1133; 2 Fletcher Cyc. Corp. (Perm. Ed.) §413. See also Alward v. Broadway Gold Min. Co., 94 Mont. 45, 53-54, 20 P.2d 647.

The requirement for directors to act as a board rather than individually is based upon the ground that they are not authorized to act in any other way than by meeting and conferring and not on the ground that they cannot act in any other way. Therefore the stockholders or directors and corporation may be estopped to deny the validity of their action where it is the custom or usage of the directors to act separately or where benefits have been received or the actions subsequently acquiesced in or ratified by the directors. 2 Fletcher Cyc. Corp. §394, §429 et seq.; 19 C.J.S. Corporations §1016 et seq., p. 1015; American B. & T. Co. v. Farmers' E. & M. Co., 63 Mont. 612, 208 P. 594.

During the course of the 90 day option period Howeth's

conduct is indicative of an acquiescence that may well constitute a ratification of the resolution passed at the November 30 meeting. Ian Davidson testified that several times during this 90 day period Howeth was advised of the resolution to repurchase his stock for $43,743.30. At no time during this period did Howeth ever object to not receiving notice.

Twice during the month of December the Davidson Company caused its attorneys to prepare a written consent to the payment terms and a promissory note, and mailed these to Howeth. Each time Howeth acknowledged receipt but failed to sign the consent forms or object to the payment. Instead Howeth requested the splitting of payment terms to limit his personal taxes and to permit the sale proceeds to pay off the debts in order to allow the release of the stock certificate from the bank. Such requests justifiably led the Davidson Company to believe that Howeth would accept repurchase pursuant to the repurchase agreement and the directors' action.

Affirmance of the district court's judgment can also be founded upon the general principles of contract law. Howeth was required by sections 58-424 and 93-2201-3, R.C.M. 1947, to state his objections to the December 2 and December 15 tenders.

Section 58-424, R.C.M. 1947 provides:

"Objections to mode of offer. All objections to the mode of an offer of performance, which the creditor has an opportunity to state at the time to the person making the offer, and which could be then obviated by him, are waived by the creditor, if not then stated."

Section 93-2201-3, R.C.M. 1947 provides:

"Objections to tender must be specified. The person to whom a tender is made must, at the time, specify any objection he may have to the money, instrument, or property, or he must be deemed to have waived it; and if the objections be to the amount of money, the terms of the instrument, or the amount or kind of property, he must specify the amount, terms, or kind which he

- 10 -

requires, or be precluded from objecting
afterward."

Not only did Howeth not object to the terms and the sufficiency
of those tenders, but the district court found that he spec-
ifically requested them and agreed to accept them.  Thus the
objections he now raises were waived.  Schultz v. Campbell, 147
Mont. 439, 413 P.2d 879; Sherlock v. Greaves, 106 Mont. 206,
76 P.2d 87.

The estoppel and waiver contention is grounded upon the
equitable principle of estoppel.  That doctrine is set out in
section 93-1301-6(3), R.C.M. 1947, which provides:

"Whenever a party has, by his own declaration,
act, or omission, intentionally and deliberately
led another to believe a particular thing true,
and to act upon such belief, he cannot, in any
litigation arising out of such declaration, act,
or omission, be permitted to falsify it."

This Court has further defined estoppel and its essential
elements in Hustad v. Reed, 133 Mont. 211, 223, 321 P.2d 1083:

"In defining this doctrine this court in Mundt
vs. Mallon, 106 Mont. 242, 249, 76 P.2d 326, 329,
and reiterated in City of Billings v. Pierce
Packing Co., supra, said:

"'"Generally speaking estoppel arises when a
party by his acts, conduct, or acquiescence has
caused another in good faith to change his posi-
tion for the worse. [Citing cases.]  The follow-
ing six essential elements have been held neces-
sary to constitute an equitable estoppel:  '1.
There must be conduct--acts, language, or silence--
amounting to a representation or a concealment
of material facts.  2. These facts must be known
to the party estopped at the time of his said
conduct, or at least the circumstances must be
such that knowledge of them is necessarily im-
puted to him.  3. The truth concerning these facts
must be unknown to the other party claiming the
benefit of the estoppel, at the time it was acted
upon by him.  4. The conduct must be done with the
intention, or at least with the expectation, that
it will be acted upon by the other party, or under
such circumstances that it is both natural and
probable that it will be so acted upon.  5. The
conduct must be relied upon by the other party,
and thus relying, he must be led to act upon it.
6. He must in fact act upon it in such a manner
as to change his position for the worse; in other

words, he must so act that he would suffer a
loss if he were compelled to surrender or forego
or alter what he has done by reason of the first
party being permitted to repudiate his conduct
and to assert his rights inconsistent with it.'"'
[117 Mont. 255, 161 P.2d 640.]"

The six essential elements are met in this case. First,
Howeth's response to the phone calls indicated his willingness
to sell, i.e. requesting payments to be made to banks and the
remaining balance which he would receive be deferred to 1971 for
tax purposes. Ian Davidson and MacFadden testified that Howeth
promised to sell. Second, Howeth knew of the resolution passed
at the meeting of November 30. And yet he testified that he
never intended to sell his stock at 50% of book value. He never
objected during this time to not receiving notice. Third, Howeth's
conduct led the Davidson Company to believe the consent to pur-
chase would be signed. They had no reason to believe that Howeth
would object to the repurchase or object to not receiving notice.
Fourth, based on the circumstances Howeth knew that his failure
to object would be relied upon by the Davidson Company and that
a meeting with notice to all directors would not be had within
the 90 day period unless he objected. Fifth, although a formal
meeting could have been called had Howeth objected, the corpor-
ation held no such meeting because it relied upon Howeth's fail-
ure to object and his promise to sign the consent papers. Sixth,
by relying on Howeth's representations the Davidson Company failed
to call another meeting of the board with the requisite notice.
By so doing the option period expired during which time the cor-
poration's right to repurchase could be exercised. The above facts
estop Howeth from asserting that the tenders were not timely.

The principles of waiver and estoppel are especially
applicable to an option contract such as the one before us. Al-
though time is of the essence in an option contract, the rule is
well established that an optionor who has given a right to an

- 12 -

optionee may not do any act, or omit to perform any duty, calculated to cause the optionee to delay in exercising the right. If he does the optionee may be excused from exercising his option within the stated time. This principal has been succinctly summarized in 17 Am Jur 2d, Contracts §61, p. 399, as follows:

> " * * * Thus, in this respect, the optionor may not make statements or representations calculated to cause delay * * *. Nor may the optionor, by his absence or evasive conduct, cause the optionee to delay in exercising his right to purchase * * * within the specified time. It has been held that if an optionor has prevented the exercise of the option within the stipulated period, the optionee is entitled to a reasonable time for action after the condition which necessitated the delay has ceased."

Contracts making time of the essence, and providing for termination on default, will be enforced unless provisions are waived, or the party is estopped from asserting them. Huffine v. Lincoln, 87 Mont. 267, 287 P. 629. An optionor may expressly or by voluntary acts or conduct, waive a requirement of a contract of option to purchase, that exercise of the option shall be made within a limited time, thereby excusing, under the general principles relating to waiver, a delay of the optionee in that regard. 17 Am Jur 2d, Contracts §61.

Estoppel does apply when as in this case, it was intended that the promise should be relied upon and a refusal to enforce it would sanction a fraud or would result in injustice, especially, if the promise or representation concerns the intended abandonment of existing rights. See Fiers v. Jackson, 123 Mont. 242, 211 P.2d 968.

In this case failure to exercise the option would result in the abandonment of the right to purchase Howeth's stock certificate. Instead of telling Ian Davidson that he would not sell his stock, he requested that the banks be paid, he requested terms

of payment which would give him favorable tax results, and he promised and agreed to return the consents embodying those terms. Howeth's conduct evidencing his willingness to sell and his requesting the change in payment terms caused the Davidson Company's delay in exercising its option. Accordingly, Howeth is now estopped to object to the timeliness of the tender.

The second issue involves the contention by Howeth that forced sale of his stock at 50% of book value is a harsh forfeiture from which this Court should grant him relief in accordance with the provisions of section 17-102, R.C.M. 1947. The cases decided under that section almost all involve the rights of a defaulting purchaser in a purchase contract. Equity will intercede in cases where forfeiture of the purchaser's equitable title is provided by the purchase contract in the event of his default. If the defaulting purchaser can make a showing that he is equitably entitled to such relief and that his breach of duty was not grossly negligent, willful or fraudulent, the courts will, in proper cases, relieve the defaulting purchaser from the forfeiture. See Kovacich v. Metals Bank & Trust Co., 139 Mont. 449, 365 P.2d 639; Shuey v. Hamilton, 142 Mont. 83, 381 P.2d 482.

Howeth was allowed to buy stock in 1965 as a fringe benefit to encourage participation in the corporate affairs. He paid less than one-half of book value for that stock, a total of $15,000.00. At that time Howeth signed the repurchase agreement whereby the corporation could buy back the stock at 50% of book value (or up to 100% if the corporation so approved) in the event of termination of his employment. Five years later the corporation exercised its option upon Howeth's termination as an employee at one-half of book value, which is $43,473.30. That is an increase of $28,473.30 over what he paid for it.

Howeth's forfeiture argument is premised upon his assertion

- 14 -

that his efforts greatly contributed to the increase in the book value of the Davidson Company stock. The record indicates that over the years Howeth was well compensated for his efforts. Often times this was in the form of commissions directly resulting from a percentage of his sales in addition to his regular salary. Additionally the substantial gain in the book value of his stock under the repurchase agreement rewarded his efforts. Under such circumstances no harsh forfeiture is involved.

The final issue presented for review is whether Ian Davidson's testimony concerning Howeth's promises and agreements by oral telephone conversations violate the parol evidence rule. See section 13-907, R.C.M. 1947.

Parol evidence is not admissible to vary and contradict the terms of a written contract. 1st Nat. Bank v. Soil Cons. Dis., 130 Mont. 1, 293 P.2d 289. But parol or other extrinsic evidence not showing a modification or change in the terms of the original writing may be admitted to show that a party to a contract has waived the benefit of, or become estopped to assert, his rights under some or all of the provisions in his favor in the agreement. 32A C.J.S., Evidence §966; Flint v. Mincoff, 137 Mont. 549, 353 P.2d 340.

The oral conversations were not introduced to vary the terms of the contract but rather to demonstrate that the tender and acceptance under the stock repurchase agreement had in fact been made. Accordingly, there is no violation of the parol evidence rule.

We have examined all other contentions raised by plaintiff and find them to be without merit and requiring no further discussion herein.

The judgment of the district court is affirmed.

- 15 -

_____ _Frank J. Haswell_ _____
                    Justice

We concur:

_James T. Harrison_ _____
Chief Justice

_____

_Wesley Castles_ _____
Justices

_____
Hon. M. James Sorte, District
Judge, sitting in place of Mr.
Justice John C. Harrison.

- 16 -