**G. Dale JACKSON, Appellant,**

v.

**Paul NANGLE and Cheryl Nangle, Assignees of Alaska USA Federal Credit Union, Appellees.**

**No. 7089.**

Supreme Court of Alaska.

Jan. 20, 1984.

Harold W. Tobey, Kathryn M. Coleman, Anchorage, for appellant.

Steven P. Oliver, Anchorage, for appellees.

Before BURKE, C.J., RABINOWITZ, MATTHEWS and COMPTON, JJ., and SCHULZ, Superior Court Judge.*

## OPINION .

RABINOWITZ, Justice.

This appeal is from a superior court decision granting Paul and Cheryl Nangle (Nangles) recovery on a promissory note they held as assignees of the Alaska USA Federal Credit Union (Credit Union). The obligor on the $40,749.98 note was G. Dale Jackson. The superior court rejected all defenses which Jackson asserted and found him liable on the note and for $15,000 the Nangles had paid the Credit Union. This appeal followed.

### I.

In the mid-1970's, the Nangles became co-owners of a group of eighty-five lots known as the Barnan Subdivision. In March 1976, the Nangles entered into an agreement with Young Brothers (Young) whereby the parties agreed to develop the subdivision as joint venturers. They encountered unanticipated expenses in installing the sewerage system, however, and by the winter of 1977–78 realized that they would need an additional $1.2 million in financing for the project. Young and the Nangles then approached Jackson and persuaded him to help underwrite the Barnan development.

* Schulz, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16, of the Constitution of Alaska.

In May of 1977, Jackson submitted a written request to the Credit Union for a $1.13 million loan which was intended to cover the total development cost of the project. The letter stated that repayment of the loan was to take place at a rate of $14,700 per lot, an arrangement confirmed by a May 31, 1977 letter from Young to the Credit Union. Jackson was to receive a fee of $100,000, payable in $5,000 installments from the proceeds of the first twenty lots sold. It was estimated that each lot would sell for $21,000.

The loan agreement was executed by Jackson on June 8, 1977, but never signed by an agent of the Credit Union. It was accompanied by a note secured by a deed of trust covering the entire eighty-five lot subdivision. The final agreement differed slightly, but significantly, from the initial proposal. Paragraph 7 of the final agreement provided that the Credit Union would release a lot from the lien arising from the deed of trust upon payment of the release price *plus interest thereon to date.* The release price was $14,700. Interest on the $1.13 million loan was set at 10.8 percent per annum.

The Nangles and Jackson simultaneously entered into an agreement regarding ownership of the eight lots to which the Nangles had held title prior to the Jackson-Credit Union agreement. Since the Credit Union had insisted upon receiving a deed of trust covering all eighty-five lots in the subdivision, the Nangles agreed to put up their eight lots as additional security for the $1.13 million loan to Jackson. The Nangles deeded the lots to Jackson on June 7, 1977. However, they wished to preserve their rights in the lots vis-a-vis Jackson. Thus, the Nangles had Jackson execute a statutory quitclaim deed conveying all his interest in eight lots of the subdivision to Cheryl Nangle. Anticipating that these lots might be condemned by the State, Paul Nangle also obtained Jackson's agreement promising him $100,000 in lieu of the lots,

"for his work in this project." In essence, the Nangles regarded the eight improved lots or $100,000 payment as their "profit" on the Barnan project.[1]

The lots were developed and gradually disposed of. The Credit Union collected $14,700 plus interest on the first three or four lots sold. The remaining lots were released without the collection of additional interest. Credit Union officials acknowledged, but could not explain, the inconsistency. One official testified that any interest due was included within the $14,700 sum, since the loan was intended to have been paid off within a year. Jackson signed a deed releasing his interest on each lot as it was sold. He testified that he was not involved in determining the sum the Credit Union received for each lot as it was sold.

By early 1979, most of the lots had been sold. Approximately $40,000 remained due on the $1.13 million loan. This was apparently secured by ten or eleven lots (the Nangles' eight and two or three more). Paul Nangle persuaded the Credit Union to release five of the Nangles' lots, without consideration, in early 1979. On April 30, 1979, Jackson signed a deed of trust securing payment of $40,749.98. It was to be paid in full by July 29, 1979. Jackson testified that he signed the note in order "not to cause any waves" in the operation. Apparently, he was told by Young that the balance was outstanding because the Credit Union had misapplied certain funds which should have been used to pay off the note to reduce an unrelated obligation of Young's. In any event, Jackson testified, all parties agreed it was not his obligation, but Young's.

The note was not timely paid, however, and it was referred to the Credit Union's attorney for collection in May 1980. The Nangles, as record owners of three of the lots securing the note, received notice of the Credit Union's intent to foreclose on the property. The Nangles sold one of the

---

**1.** An agreement between Jackson and Young further provided that ownership of eight of the 85 lots was vested in Nangle and that they were being given to the Credit Union only as security for the $1.13 million loan.

three lots (Lot 1, Block 1, Unit 1) in June 1980 and paid $15,000 of the purchase price to the Credit Union. In December, 1980, the Nangles paid the Credit Union an additional $34,128.27. In return for this payment, the Credit Union released the deed of trust on Lots 1 and 2 of Block 5 and assigned the Nangles the $40,749.98 note on which Jackson was the obligor. The entire debt to the Credit Union arising from development of the Barnan Subdivision had been satisfied.

■ Thereafter, the Nangles filed suit against Jackson demanding reimbursement of the $49,128.27 they had remitted to the Credit Union to obtain the release of the deed of trust on three of their lots. Their claim was based upon the fact that they were holders of the $40,749.98 note received by assignment from the Credit Union. Jackson's response raised several affirmative defenses, including defenses based on the alleged misconduct of the Credit Union. The superior court, sitting without a jury, rejected all Jackson's de-

fenses except that based upon the misapplication of funds.[2] After it entered a $49,-674.25 judgment for the Nangles, Jackson appealed.[3]

## II.

■ It is uncontested that the Credit Union released five lots to the Nangles without receiving any monies in return. Jackson contends that these releases constituted a breach of the loan agreement, entitling him to a set-off of $73,500 ($14,700 × 5) in damages, which would extinguish any liability remaining on the $49,128.27 note. The superior court rejected Jackson's construction of the agreement. After reviewing the record, we are persuaded that the superior court's ruling should be upheld.[4]

■ The written loan agreement is silent on the question of whether the parties (Credit Union and Jackson) anticipated collecting $14,700 upon the sale of each of the seventy-seven or eighty-five lots. It is

2. Because the Nangles were not holders in due course, they took the note subject to Jackson's defenses against the Credit Union. See AS 45.03.306, which provides in relevant part:

Unless he has the rights of a holder in due course, a person takes the instrument subject to ...
(2) all defenses of a party which would be available in an action on a simple contract;
(3) the defenses of want or failure of consideration ....

Although the note was not payable to order or bearer, and was therefore not a negotiable instrument, AS 45.03.104(a)(4), AS 45.03.306(2) governs the transaction by virtue of AS 45.03.805. AS 45.03.805 provides that "[s]ections AS 45.03.101–45.03.805 apply to an instrument whose terms do not preclude transfer and which is otherwise negotiable within AS 45.03.101–45.03.805 but which is not payable to order or to bearer, except that there can be no holder in due course of such an instrument."

Jackson's affirmative defenses included procedural challenges to the validity of the assignment, allegations that the Credit Union breached the loan agreement by failing to collect interest on each lot sold and by releasing lots to the Nangles without consideration, and an assertion that the Credit Union misapplied $9,192.93 collected upon sale of the Barnan lots to an unrelated obligation running from Young to the Credit Union.

3. The Nangles did not file a cross-appeal disputing the court's allowance of the $9,192.93 set-off. In their brief, the Nangles do dispute the validity of the set-off. However, because of their failure to comply with App.R. 204(a), we decline to consider the Nangles' dissatisfaction with the superior court's ruling regarding the $9,192.93 set-off. See Alaska Brick Co. v. McCoy, 400 P.2d 454, 457 (Alaska 1965).

4. In reviewing the superior court's holding, we have declined to follow Jackson's suggestion that this issue involves merely the interpretation of a written contract, and that we are therefore free to exercise our independent judgment. Jackson relies in part on Peterson v. Wirum, 625 P.2d 866, 871 (Alaska 1981). This argument is untenable, since Peterson and its predecessors were explicitly confined to situations where there was no extrinsic evidence in dispute. See Peterson, 625 P.2d at 871 n. 9. In this case, extrinsic evidence was presented regarding the very question now disputed, see infra note 5. The factual findings based upon this evidence should not be reversed unless clearly erroneous, Civil Rule 52(a), and this court is confined to determining whether the facts, viewed most favorably to the Nangles, support the superior court's interpretation of the agreement. Wright v. Vickaryous, 598 P.2d 490, 497 (Alaska 1979).

therefore necessary to resort to extrinsic evidence to resolve the question.[5]

■ The Nangles' position that their eight lots were not subject to the $14,700/lot repayment requirement is supported by the following evidence. First, the "pro forma" attached to the Jackson-Young agreement indicates that the parties anticipated collecting "$14,700 per lot based on 77 lot sales." Second, Jackson's loan request indicated the $1.13 million loan would be repaid "on a pro rata basis of $14,700 per lot." In light of the fact that $14,700 multiplied by 77 yields $1,131,900, a sum almost identical to the $1.13 million value of the Jackson loan, it is reasonable to conclude that the parties did not contemplate that proceeds from the sale of the Nangles' eight lots would be applied to reduce Jackson's obligation to the Credit Union.

Jackson contends that evidence to the contrary includes the fact that the $1.13 million loan was secured by a lien on all eighty-five lots. However, the scope of the Credit Union's security interest is not conclusive with regard to the financial relationship between Jackson and the Nangles, which is what is at issue here. The superior court concluded that the evidence regarding the financial arrangements underlying the Barnan development established an agreement between the Nangles and Jackson "whereby [the Nangles] were to receive eight lots free and clear of indebtedness." If this finding is correct, the Credit Union's failure to collect $14,700 per lot on five of the Nangles' lots did not result in any damage to Jackson.

The only evidence in the record which possibly indicates that the Credit Union and Jackson did anticipate collection of $14,700 on each of the eighty-five lots was the testimony of Fred Smith, the Credit Union's senior real estate officer, regarding provision for interest on the loan. He stated that "85 lots times the $14,700 comes out to like a million-four-plus. Such that if all 88 lots have paid off within like a year's time, there would have been adequate funds to have paid off our loan including interest." Thus, at least one Credit Union officer did, apparently, construe the loan agreement to require repayment from all eighty-five lots. However, this testimony alone is insufficient to warrant a reversal under the "clearly erroneous" standard in light of the substantial evidence to the contrary.

Therefore, we conclude that the superior court's determination that the Nangles were entitled to eight lots "free and clear" should be upheld. The superior court properly rejected Jackson's contention that he was entitled to a set-off of $73,500 as a result of the Credit Union's release of the five lots.

### III.

We turn now to Jackson's contention that the Credit Union breached the loan agreement by failing to collect interest upon the proceeds of the sale of each lot. The superior court concluded that no view of the evidence supported Jackson's contention that the Credit Union had an obligation to release lots at $14,700 plus interest. Jackson challenges this finding on the ground that the written loan agreement

---

**5.** The following agreements, taken together, establish the basic financial structure of the Barnan development, including the Jackson-Nangle agreement vis-a-vis ownership of the 8 lots for purposes of repayment of the $1.13 million loan:

First, as between the Nangles and Young, the Nangles were entitled to eight unencumbered lots upon project completion. Second, the Young-Jackson agreement acknowledged that the Nangles were entitled to eight of the 85 lots and that the Nangles were "giving them only as additional security to Alaska USA Federal Credit Union for the development loan ...." Third, as

consideration for the conveyance of their lots to Jackson for purposes of execution of the deed of trust, the Nangles received improvements on the lots. Fourth, a Nangle-Jackson-Young agreement stated that the Nangles were to receive $100,000 in the event the property was condemned or development did not take place. Jackson and Young agreed to hold the Nangles harmless from the Deed of Trust. Fifth, Jackson signed a quitclaim deed after execution of the deed of trust conveying his interest in the lots to Cheryl Nangle. Finally, Young (now bankrupt) agreed to indemnify Jackson for liability on obligations such as that at issue here.

provided that the Credit Union was only to release each lot upon payment of a set price "plus interest thereon to date of payment in full," and that interest was indeed collected on the first few lots sold.[6]

We find it unnecessary to determine whether the superior court erred in ruling that the Credit Union had no obligation to collect interest as each lot was sold. For even assuming that Jackson's interpretation of the loan agreement is correct, we conclude that he is precluded by the doctrine of waiver from asserting this defense.

■ It is well-established that if parties to a contract adopt by conduct a mode of performance differing from its strict terms, neither party can assert a breach because the contract was not fulfilled according to its letter. *Quin Blair Enterprises, Inc. v. Julien Construction Co.*, 597 P.2d 945, 951 n. 6 (Wyo.1979).[7] A waiver may be accomplished explicitly or implicitly, the latter arising "where the course of conduct pursued evidences an intention to waive a right, or is inconsistent with any other intention than a waiver, or where neglect to insist upon the right results in prejudice to another party." *Milne v. Anderson*, 576 P.2d 109, 112 (Alaska 1978).

■ Here Jackson raised no objection to the Credit Union's alleged failure to collect interest throughout the three-year period when the disposition of the lots took place. As the owner of record, his signature on the deed was required to complete each transaction. Prior to each closing, Jackson was given the opportunity to examine a ledger sheet showing how the escrow company intended to disburse the proceeds of the sale. His failure to voice contemporaneous objections to the bank's failure to collect interest at the time of sale precludes him from relying upon this as a defense now, for it amounted to "direct, unequivocal conduct indicating a purpose to abandon or waive the legal right," *Milne*, 576 P.2d at 112, if any, which Jackson may have held under the contract to require collection of accrued interest on each lot sale. Therefore, we find no error in the superior court's rejection of this defense.

## IV.

Jackson's third defense to liability on the note consists of a challenge to the validity of the Credit Union's assignment of the note to the Nangles. He contends that the assignment was void because it was executed by the Credit Union's attorney, who lacked authority to do so, and because the Credit Union failed to comply with federal regulations governing such assignments. The superior court rejected these arguments, concluding that any defects in the Credit Union's assignment were cured by ratification of the assignment by the Board of Directors of the Credit Union.

Jackson's argument is that the Credit Union's failure to comply with 12 C.F.R. 701.21–8 (1981) invalidated the assignment of the note to the Nangles.[8] The regula-

---

**6.** The loan agreement stated, in relevant part:
7. *Releases:* Provided there is no default under this Agreement, the Note and Deed of Trust, the Lender agrees that it will release from the lien and operation of the Deed of Trust any unit, lot, parcel or other portion of Security provided the entire proceeds are applied against the Note on the sale of this property for cash for not less than the amount as established by the attached Schedule Exhibit "A". Said application shall be made first to interest, then due and payable on said loan, and then to the principal balance outstanding.
Exhibit A provided:
Any time prior to default, the Lender shall cause to be reconveyed to the Borrower any one or more of the following parcels under the designated release price plus interest thereon to date of payment in full.

Exhibit A did not specify a release price. Nor did the parties list parcels to be reconveyed.

**7.** *See also Stewart v. Cunningham*, 219 Kan. 374, 548 P.2d 740, 745 (1976); *State ex rel. Howeth v. D.A. Davidson & Co.*, 163 Mont. 355, 517 P.2d 722, 729 (1973); *Hart v. Hoisting & Portable Engineers*, 253 Or. 158, 451 P.2d 859, 860 (1969); *Evans v. Laurin*, 70 Wash.2d 72, 422 P.2d 319, 321 (1966).

**8.** 12 C.F.R. 701.21–8 (1981) provided, in relevant part:
§ 701.21–8 Purchase, sale, and pledge of eligible obligations.
(a) For purposes of this section:
(1) "Eligible obligation" means a loan or group of loans, other than a line of credit

tion provides, in relevant part, that the board of directors or investment committee of a credit union must approve sales of "eligible obligations" of its members. 12 C.F.R. 701.21-8(c)(1)(i). It was established that neither the Board nor the Credit Committee of Alaska USA authorized the assignment of Jackson's loan to Nangle before the sale was consummated.

In defense of the assignment, the Nangles argue that such prior approval was unnecessary because the Board of the Credit Union had promulgated a policy on June 20, 1979, delegating to management its authority to approve such sales. Specifically, the policy provided that "[t]he sale of eligible obligations may be made, in whole or in part, to any source, at any time. Management is authorized to deliver and accept payment for loans sold." Although, as Jackson points out, the Credit Union attorney who endorsed the note to the Nangles was neither an officer nor an employee of that entity but rather an "independent contractor," he was acting under orders from Fred Smith, the senior real estate officer of the Credit Union, who did

have the requisite authority. Smith executed a written ratification August 27, 1981. Similarly, although Jackson correctly asserts that the internal policy was violated because no report was made to the Board regarding the sale, he is unable to refute persuasively the Nangles' response that the October 28, 1981 ratification of the assignment by the Board cured any problems which might have arisen from the violation. Instead, Jackson relies upon allegations that both post-sale ratification and the internal policy delegating authority over loan sales to management [9] represented unwarranted departures from the underlying purpose of the regulatory scheme. He contends that the prior-approval requirement expresses a concern that the decision to sell be made initially by those best able to ensure that it is well-founded, although he can point to no authority supporting such an interpretation.

■ In the absence of a more compelling argument that any alleged violation of 12 C.F.R. 701.21-8 resulted in harm to Jackson [10] or to anyone else, we agree with

loan, except, however, the term shall include a line of credit loan of a liquidating credit union.

. . . . .

(c) *Sale.* (1) A Federal credit union may sell, in whole or in part, to any source, eligible obligations of its members, eligible obligations purchased in accordance with paragraph (b)(1)(ii) of this section, student loans purchased in accordance with paragraph (b)(1)(iii) of this section, and real estate loans purchased in accordance with paragraph (b)(1)(iv) of this section, within the limitations of the board of directors' written sale policies, *Provided:*

(i) *The board of directors or investment committee approves the sale; and*

(ii) A written agreement and a schedule of the eligible obligations covered by the agreement are retained in the seller's office. [Emphasis added.]

12 C.F.R. 701.21-8 was promulgated pursuant to authority given the National Credit Union Administration Board by 12 U.S.C. § 1757. Federal credit unions were first given the power to sell member obligations when Pub.L. 95-22, § 303(c) and (d), was enacted on April 19, 1977. *See* 12 U.S.C.A. § 1757, Historical note, p. 27. 12 U.S.C. § 1757 provides, in relevant part:

A Federal credit union . . . shall have power . . . (13) in accordance with rules and regula-

tions prescribed by the Board, to purchase, sell, pledge, or discount or otherwise receive or dispose of, in whole or in part, any eligible obligations (as defined by the Board) of its members . . . .

12 C.F.R. 701.21-8 was amended in July 1981—after the note was assigned to the Nangles, but before a Credit Union officer and the Credit Union directors ratified the assignment—in ways not relevant to this opinion. *See* 46 Fed. Reg. 38,680 (1981); 12 C.F.R. 701.21-8 (1982).

9. The policy provided that:

Management will submit to the Board of Directors each month a report detailing loans sold. The report will be a photocopy of the delivery schedule of each secondary market entity purchasing loans during the month.

10. On appeal, the Nangles raise for the first time the claim that Jackson lacks standing to object to the assignment on the ground that it violated federal regulations. We decline to consider the merits of this contention, since we have previously held that failure to raise the issue of capacity to sue results in a waiver of that defense. *Brown v. Music Incorporated,* 359 P.2d 295, 300-01 (Alaska 1961); *accord, King v. Petroleum Services Corp.,* 536 P.2d 116, 118 (Alaska 1975) (per curiam).

the Nangles that the post-sale ratification was validated by 12 U.S.C. § 1757(15), which empowers a credit union "to exercise such incidental powers as shall be necessary or requisite to enable it to carry on effectively the business for which it is incorporated." Since ratification by a board of previously unauthorized acts is regarded as a standard procedure in the conduct of corporate affairs, see Fletcher, *Cyclopedia of Corporations* § 762 (1982), it should be considered an "incidental power" under 12 U.S.C. § 1757(15) which could be exercised to bring the assignment into conformity with 12 U.S.C. § 1757(13). We are unpersuaded by Jackson's unsupported allegation that such a construction of the statute would vitiate the regulatory provision at issue. Therefore, we agree with the superior court that any defects in the original assignment were cured by the post-sale ratification.

### V.

Jackson contends that the superior court erred in denying him leave to join certain third party defendants. Five months after he had filed his answer, Jackson moved for leave to join Young (the partners individually as well as the partnership) and the Credit Union as third party defendants.

▇▇▇ The motion to join Young as a defendant was made pursuant to Civil Rule 14(a).[11] In *Kopan v. George Washington University*, 67 F.R.D. 36 (D.D.C.1975), the court observed that the factors which must be considered in determining whether the trial court abused its discretion[12] in ruling on a motion to file a third party complaint include

> possible prejudice to the plaintiff, complication of issues in the trial, likelihood of causing delay in the trial, timeliness of the motion to implead, the merit or substance of the third party complaint, and additional expense to the parties.

67 F.R.D. 36 at 38. Because Jackson made his motion only a month before trial—despite the fact that his agreement with Young had been in effect since 1977—the motion would probably have forced postponement of the trial. Although the claim was meritorious and might not have complicated the proceedings unduly (since the Young-Jackson contract was drawn into the Nangle-Jackson dispute), little would be gained at this point by a remand for retrial with Young as a named party, since Young has confessed liability to Jackson. Thus, any error in the superior court's denial of the joinder motion was harmless error.

▇▇▇ Jackson's motion to join the Credit Union as a third party defendant was not properly predicated upon Rule 14(a), since the Credit Union had no obligation to indemnify Jackson for any liability on his part to the Nangles. Rather, Jackson was essentially asserting a counterclaim against the Nangles as transferees of the Credit Union.[13] Under Civil Rule 8(c),[14] the superior court had discretionary authority to treat the defense as a counter-

---

11. Civil Rule 14(a) provides, in relevant part: At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to him for all or part of the plaintiff's claim against him. The third-party plaintiff need not obtain leave to make the service if he files the third-party complaint not later than 10 days after he serves his original answer. Otherwise he must obtain leave on motion upon notice to all parties to the action.

12. *See generally* cases holding that trial courts have discretion regarding leave to amend pleadings, e.g., *Estate of Thompson v. Mercedes-Benz, Inc.*, 514 P.2d 1269 (Alaska 1973).

13. Civil Rule 13(a) provides in relevant part: A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

14. Civil Rule 8(c) provides in part: When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation.

claim, and, under Civil Rule 13(h),[15] the court was authorized to permit joinder of the Credit Union as a defendant to the counterclaim. Joinder would have been permissive under Civil Rule 20,[16] since the Credit Union was not an indispensable party.

■ We must determine whether the superior court abused its discretion [17] by denying Jackson's motion to join the Credit Union, and, if so, whether this constitutes reversible error. The Credit Union would have been a proper party defendant to the counterclaim (mistakenly designated as an affirmative defense) which charged it with negligence in inducing Jackson to execute the April 1977 note. Indeed, since the Nangles conceded that they took the note subject to all of Jackson's defenses against the Credit Union, these issues became the principal subjects of dispute at trial. Joinder of the Credit Union would have been advisable to "expedite justice," since under AS 45.03.417(b)(4),[18] it appears likely that the Nangles had a cause of action against the Credit Union for breach of the warranty it gave them upon assignment of the note in question.[19] Nevertheless, Jackson's joinder motion was untimely and, as a result, might have delayed the trial if granted. Furthermore, since relief was granted on the counterclaim despite the absence of the Credit Union as a party, and that set-off is not the subject of a proper cross-appeal,[20] any error in the superior court's ruling was harmless as to Jackson.

## VI.

■ Paradoxically, Jackson also challenges the one ruling of the superior court which favored him. In its memorandum decision the superior court concluded that the Credit Union wrongfully applied $9,192.93 collected from the sale of Barnan property to an unrelated obligation of Jerry Young to the bank. Thus, the superior

**15.** Civil Rule 13(h) provides:

Persons other than those made parties to the original action may be made parties to a counterclaim or cross-claim in accordance with the provisions of Rules 19 and 20.

**16.** Civil Rule 20 provides in part:

All persons may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all of them will arise in the action.

**17.** *See Horton Co. v. International Telephone & Telegraph Corp.*, 85 F.R.D. 369 (W.D.Pa.1980), where the court observed in ruling on a defendant's motion to join the plaintiff's surety as a party defendant to a counterclaim, that

The purpose of [Rule 20] is to promote trial convenience and expedite the final resolution of disputes. Wright & Miller, Fed. Practice and Procedure § 1652 (1972). Joinder under Rule 20 is not required unless it would otherwise be required under Rule 19(a); rather, it is discretionary if, in the eyes of the Court, joinder would expedite justice.

*Id.* at 371. Federal rules 19(a) and 20 are identical to Alaska Civil Rules 19(a) and 20.

The *Horton* court noted that its discretion to grant joinder under Rule 20 was limited in only two respects: "[F]irst, a right to relief must be asserted which arose from the same transaction or occurrence and, second, a question of law or fact common to all the parties must arise in the action." 85 F.R.D. at 371.

**18.** AS 45.03.417(b) provides that:

A person who transfers an instrument and receives consideration warrants to his transferee ... that ... (4) no defense of any party is good against him; ....

*See also* 12 C.F.R. 701.21–8(c)(3)(i) (1981), specifically permitting a credit union to enter into "[a]n agreement which requires the seller [credit union] to repurchase the eligible obligation because of any breach of warranty or misrepresentation." Although this provision was deleted in July 1981 [as part of a plan "to allow Federal credit unions to compete with other lenders," 46 C.F.R. 38,679 (1981) ], it is relevant to show that Federal credit unions have always been potentially liable on warranty theories. The question of the effect of the federal regulation was not addressed by the parties since it concerned the Credit Union—Nangle relationship, which was not at issue in these proceedings.

**19.** AS 45.03.413(a) provides in relevant part:

The maker or acceptor engages that he will pay the instrument according to its tenor at the time of his engagement....

As explained at note 2, *supra,* the transaction which forms the basis of this litigation is governed by AS 45.03.101–45.03.805 by virtue of AS 45.03.805.

**20.** *See supra* n. 3.

court indicated that it was reducing the total Jackson owed on the note by that amount. The superior court's findings, made two months later, do not explicitly state that this adjustment was made because of misapplication of funds by the Credit Union, nor is an explanation given of the means by which the superior court arrived at the specific figures set out in its findings. Jackson argues that these deficiencies render the findings inadequate under Civil Rule 52(a).[21]

We reject Jackson's contention that the findings were insufficient. In *Urban Development Co. v. Dekreon*, 526 P.2d 325, 328 (Alaska 1974), it was observed that Civil Rule 52(a)

> does not invariably require that the findings and conclusions be properly labeled, or even that express findings be made on all questions, so long as the record clearly indicates that the court considered the matter and resolved each critical factual dispute.

In *Dekreon*, we found no error in the adoption by the superior court of its oral decision as its findings as fact. Similarly, in this case the superior court's memorandum decision clearly indicates the basis for the adjustments made to the balance due on the note. Although the figures do not precisely match, discrepancies may be attributed to the accrual of interest on the various sums.[22] It would have been preferable for the court's calculations to have been included in its findings, but this omission alone does not warrant a remand since the purpose of Rule 52(a) has been fulfilled by the findings which were in the record.

## VII.

Finally, we consider Jackson's contention that the superior court erred in failing to confine the Nangles' recovery to the face value of the note less the set-off to which they were entitled. The court awarded the Nangles "$15,000 by virtue of their payment to the Credit Union on June 30, 1980" as well as "$22,560.22 by virtue of the valid assignment of defendant's note to them by the Credit Union on December 11, 1980." Jackson argues that the Nangles are not entitled to recover the $15,000 sum. We disagree.

Jackson correctly asserts that a party suing as holder of a note is limited to recovering only the face value of the note.[23] Although the Nangles have consistently alleged that they are suing simply as assignees of the $40,749.98 note,[24] it is apparent that the Nangles have equally consistently included the $15,000 payment

**21.** Alaska R.Civ.P. 52(a) provides in part:

In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon....

*Dickerson v. Geiermann*, 368 P.2d 217, 219 (Alaska 1962), construed this rule to require the trial court

to deal adequately with and state with clarity what it finds as facts and what it holds as conclusions of law. The findings and conclusions should be so explicit as to give this court a clear understanding of the basis for the decision made.

(Footnotes omitted.)

**22.** Testimony presented by the Credit Union's senior real estate officer formed the basis for the calculations contained in the July 9, 1982 findings. He stated that misapplication of the $9,192.93 resulted in a net overcharge of $11,572.28 (including interest). Thus, as of December 11, 1980, the balance due on the Jackson note was $34,128.27 less $11,572.28, or $22,555.99. The superior court arrived at $22,560.22 by adopting $11,568.05 as the proper adjustment, a figure quoted by the bank officer later in his testimony as the correct figure. It also arrived at the April 30, 1979, figure of $31,425.89 on the basis of uncontradicted testimony. Thus, the record clearly reveals the basis for the court's findings.

**23.** AS 45.03.413(a) specifically provides that "[t]he maker ... [of a note] engages that he will pay the instrument *according to its tenor* at the time of his engagement...." (Emphasis added.)

**24.** *See, e.g.,* statements in their pleadings below: "The Nangles' position in this litigation ... is a holder"; "If the assignment is valid, then the legal issue is whether there are any defenses to offset the claim. I do not see any other legal issue"; "This lawsuit is a complaint by the assignees to collect the funds paid by the assignees against the borrower, G. DALE JACKSON"; "[The Nangles] have sued as holders of the note."

in their requests for relief. In their complaint, they requested $49,128.97 in damages which represented the sum of the two payments they had made ($15,000 + $34,128.27) to obtain the note. Although it was not until they prepared their appellate brief that the Nangles articulated a theory on which to predicate their demand for a sum exceeding the face value of the note—restitution[25]—Jackson has been on notice throughout these proceedings that the Nangles were suing for the full sum they had paid to release their lots from the deed of trust rather than merely the face value of the note.

■ Given those facts we do not believe that this is an appropriate case for the invocation of the rule enunciated in *Brown v. Wood*, 575 P.2d 760, 766 (Alaska 1978), *modified*, 592 P.2d 1250 (Alaska 1979) (holding that a theory of recovery which was not included in a complaint, briefed or argued at trial, and was not the subject of any ruling by the superior court, would not be considered for the first time on appeal). Rather, we rely on the principle enunciated in *Mitchell v. Land*, 355 P.2d 682 (Alaska 1960), where we observed approvingly that

> [i]n the one-form-of-action procedure under the Federal Rules of Civil Procedure, it has been held that parties should be granted the relief to which they are entitled irrespective of the theory of their pleading; and that a court is not justified in depriving a party of his rights because he mistakes the nature of his remedy.

*Id.* at 687 (footnotes omitted). *Accord, Brayton v. City of Anchorage*, 386 P.2d 832, 833 (Alaska 1963). We hold that the Nangles should not be deprived of their right to recover damages on a theory of

restitution because they explicitly relied on their status as assignees in bringing this suit. Therefore, we conclude that the superior court's full award should be upheld.

The superior court's judgment is AFFIRMED.

MOORE, J., not participating.

---

**25.** The Nangles rely upon the Restatement of Restitution § 103 (1937) which provides:

> A person who, to prevent the lawful taking or detention of his things or to redeem his things which have been lawfully taken or detained, has discharged the duty of another in whole or in part, is entitled
> (a) to indemnity from the other if, as between the two, the other should have performed such duty, or
> (b) to contribution if the amount so paid is greater than the proportionate share which, as

between the two, should have been borne by the person who paid.

The first illustration to this section reveals its direct applicability to the case before us:

> A, at B's request, pledges his own shares with C as security for the payment of a debt of $1000 owed by B to C. B fails to pay the debt and, to release the securities, A pays C $1000. A is entitled to reimbursement of $1000 from B ....

*Id.* at 433.