Alice Rodes **FITCH**, Robert M. Fitch, Suzanne H. Fitch, Robert R. Fitch, as parent and natural guardian of Margaret McCutchen Fitch, a minor, and Kathryn Rodes Fitch, a minor, and Suzanne H. Fitch, as parent and natural guardian of Margaret McCutchen Fitch, a minor, and Kathryn Rodes Fitch, a minor, Plaintiffs,

v.

**MIDLAND BANK & TRUST COMPANY,** Defendants and Third Party Plaintiffs–Appellants,

v.

Frank A. **WOODS**, C. Ron Woods and the Law Firm of Bone and Woods, a professional corporation, Third Party Defendants–Appellees.

Court of Appeals of Tennessee, Middle Section, at Nashville.

July 10, 1987.

Permission to appeal Denied by Supreme Court Sept. 28, 1987.

Gary L. Jewel and George B. Rich, Memphis, for defendants and third party plaintiffs-appellants.

Lionel R. Barrett, Jr., Lionel R. Barrett, Jr., P.C., Nashville, for third party defendant-appellee, Frank A. Woods.

Douglas Fisher, Howell, Fisher, Branham & North, Nashville, for third party defendant-appellee, Bone and Crawford.

## OPINION

FRANKS, Judge.

After judgment was entered against defendant bank on a letter of credit and following the trial of the third party complaint against two former officers and directors and the law firm involved in the letter of credit transaction, the chancellor dismissed the third party complaint which was based on alleged negligence, breach of fiduciary duty and conspiracy to defraud.

We adopt pertinent findings by the chancellor:

G. Ron Woods was President of the Bank of Dickson and in January of 1982, was also employed as President of the United Southern Bank of Humphreys County,[1] hereinafter called Humphreys County Bank. Frank Woods was chairman of the Finance Committee and a member of the Board of the Humphreys County Bank. Ron Woods, as well as Frank Woods, had lending authority up to the legal lending limit of the Humphreys County Bank. Ron Woods spent three days per week at Humphreys County and the remainder of his time at the Dickson County Bank, continuing as President of both Banks.

A tender offer had been made to shareholders of the Bowling Green Bank by a group of persons including Mr. Bone, Mr. Frank Woods and C.H. Butcher, which culminated in their acquiring, after prorating an over response to their tender offer, 40,000 shares of the Bowling Green Bank. This purchase was financed by the First National Bank of Louisville, Kentucky, which loaned Two Million Dollars toward the Three Million Dollar purchase.

The Loan agreement executed between the Bank and C.H. Butcher, who was

---

1. On June 30, 1983, United Bank of Humphreys County was merged into Midland Bank and Trust Company.

serving as Trustee under a Trust Agreement entered into between all the purchasers, also encompassed within it, the Fitch Agreement. The Fitch Agreement contained a "put" option to the Fitch family as well as a "call" option to C.H. Butcher. The other purchasers were not a party to the Fitch Agreement. In the event of non-performance of the Fitch Agreement, then the First National Bank of Louisville had an option to consider this as a default. Pursuant to the Fitch Agreement, the "put" was made and, in response thereto, a letter of credit was issued by the Humphreys County Bank to secure the payment of the purchase price to the Fitch family.

The firm of Bone and Woods, through primarily Mr. Norton, represented the entire group of purchasers insofar as the tender offer was concerned and had input into the loan agreement. G. Ron Woods had limited experience with letters of credit, but was aware of C.H. Butcher's financial status by virtue of dealings Butcher had had with Dickson Bank. Frank Woods called Ron Woods and asked if he would sign a letter of credit and further advised him that Bone and Woods were preparing the letter of credit and would be forwarding it to him. The amount of the letter of credit was within the lending authority of Frank Woods as well as Ron Woods, which authority had been granted by the Board of Directors of the Bank. The letter of credit was received and executed by Ron Woods on behalf of the Bank of Humphreys County. Prior to this time, there had been no record keeping involving letters of credit issued by the Humphreys County Bank and small letters of credit had been issued prior to this time. Ron Woods instructed his secretary to make a file on this letter of credit, to transfer it to the loan department and to see that the operations department of the Bank were advised of the letter of credit. For whatever reason, nothing was done about the letter of credit.

2. The appeal as to Ron Woods is not being pursued because he was discharged in bankruptcy.

In April of 1983, the attorney for the Fitch family appeared at the Bank and presented a draft on the letter of credit, and was advised that Bone and Woods represented the Bank and would be representing it insofar as the letter of credit was concerned. Subsequently, C.H. Butcher filed suit against the Fitch family in Davidson County and the suit was settled by issuance of a second letter of credit which was different from the first in that it contained a bankruptcy clause and extended the day of payment by some four months, this to compensate for the bankruptcy clause. A promissory note was received by the Bank upon the issuance of the second letter of credit. C.H. Butcher subsequently was the subject of involuntary bankruptcy proceeding and the Bank had been held responsible for the letter of credit.

On appeal, the bank insists Frank Woods failed to use reasonable care and diligence in carrying out his duties to the bank and violated his duty of loyalty to the bank.

Since the original letter of credit was issued by the former bank president, Ron Woods,[2] at the request of Frank Woods, the bank argues Frank Woods was involved with C.H. Butcher in other business transactions and benefited from the issuance of the letter of credit to the detriment of the bank. It is insisted that Frank Woods had an interest in helping Butcher acquire the Fitch stock and avoid the two million dollar loan he personally guaranteed going into default. Specifically, the bank argues Woods improperly authorized the letter of credit and then failed to have it approved by the board of directors.

The duty that a director or officer owes to a corporation is stated in T.C.A., § 48-1-813, which provides in pertinent part:

Directors and officers shall discharge the duties of their respective positions in good faith and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions.

*See generally, Founders Life Corp. v. Hampton,* 597 S.W.2d 897 (Tenn.1980).

This standard was likewise imposed at common law before enactment of the statute, obligating corporate officers and directors to exercise reasonable care and skill in the performance of their duties. *Neese v. Brown,* 218 Tenn. 686, 405 S.W.2d 577 (1964); *State v. Helen Shop, Inc.,* 211 Tenn. 107, 362 S.W.2d 787 (1962); *Central Bus Lines v. Hamilton Nat. Bank,* 34 Tenn.App. 480, 239 S.W.2d 583 (1951).

The statute also provides no transaction in which a director or officer has a personal or adverse interest is void or voidable solely for this reason if the transaction was fair and equitable at the time it was authorized. T.C.A., § 48–1–816(a)(3).[3]

■ Whether a director or officer has properly discharged the duties of office is a question of fact to be determined in each case in view of all the circumstances. *Neese v. Brown.* The initial letter of credit for $154,000.00 was issued April 6, 1982. At that time, C.H. Butcher, Jr's financial statement revealed a net worth of $60,000,-000.00, with two and a half million dollars in unencumbered cash. Frank Woods testified C.H. Butcher, Jr., appeared to be a creditworthy individual and there was no indication of pending bankruptcy. To Woods the credit transaction appeared to be a quick and easy way to earn the bank a one per cent fee of $1,500.00 upon the issuance of the letter of credit and the fee was subsequently paid to the bank.

■ At the time the initial letter was issued, Frank Woods as well as Ron Woods had lending authority as delegated by the board of directors exceeding the amount of the letter of credit. Moreover, at that time the bank had no formal policy on the issuance of letters of credit.

The bank argues, however, that shortly after the first letter of credit issued to Butcher the board passed a resolution establishing a letter of credit policy. The resolution provided all letters of credit were to be approved in advance by the board of directors or ratified at the next board meeting if issued without prior approval. The bank insists Frank Woods' authorization and Ron Woods' issuance of the second letter of credit to Butcher violated bank procedure because the letter of credit was never presented to the board of directors for approval.

This argument is misplaced because the so-called "second" letter of credit was not an additional letter of credit but merely a revision or amendment of the first. It did not increase the liability of the bank but, as the chancellor held, decreased the liability of the bank over time.

Finally, the evidence does not support the charge that Frank Woods was improperly motivated in authorizing a letter of credit to C.H. Butcher in order to avoid default of the First National Bank loan he personally guaranteed.

The evidence shows the First National Bank loan was adequately secured. Three million dollars' worth of stock secured a two million dollar loan; in addition, the loan agreement with First National Bank provided for "optional defaults" and "automatic defaults". If Butcher failed to comply with the Fitch agreement by not purchasing the stock after demand, the First National Bank could, at its option, choose to call the loan in default. Butcher's noncompliance, therefore, was merely an optional default and not an automatic one. Moreover, Butcher only needed to acquire three letters of credit from banks meeting the approval of the Fitch family to comply with the Fitch agreement. There is no suggestion Butcher would have been unable to obtain a letter of credit from a bank other than the United Southern Bank of Humphreys County.

In sum, the evidence establishes Frank Woods did not consider his personal interest to the exclusion of the rights and inter-

**3.** T.C.A., § 48–1–816 provides in pertinent part:
    (a) Except as otherwise provided ... no transaction in which a director or officer has personal or adverse interest shall be void or voidable solely for this reason ... if:

(3) The transaction is fair and equitable as to the corporation at the time it is authorized or approved, and the party asserting the fairness of the transaction establishes fairness.

ests of the bank. Hence, we concur and adopt the trial court's determination:

> The Court would find that no conspiracy existed between the third party defendants in this case and at the time of issuance of the first letter of credit the third party defendants, Frank Woods and Ron Woods, believed in good faith that the issuance of a letter of credit to C.H. Butcher posed no threat to the Bank; that negotiations concerning the lawsuit and the issuance of the second letter of credit were done by Frank Woods; that all defendants had some question about Butcher financial stability upon the issuance of the second letter of credit, but the Bank was not harmed by the second letter of credit because of the interest credit received therefrom, the extension of time contained therein, and the fact that if a second letter of credit had not been issued, the Bank would have been liable for the full amount of the first letter of credit.

The bank further argues the law firm of Bone and Woods is liable for not disclosing a pecuniary interest in the letter of credit and the firm's dual representation of C.H. Butcher, Jr.

In the instant case, a potential conflict of interest arose because Charles Bone, a member of Bone and Woods, was one of the investors involved in the purchase of the 40,000 shares of Bowling Green Bank & Trust Company. He also guaranteed the 2 million dollar loan with the First National Bank of Louisville and could have suffered a loss if Butcher did not acquire the Fitch stock. Additionally, Bone and Woods was involved in negotiating the Fitch agreement for Butcher but, apparently, provided no services to him after that transaction.

■ The relationship between an attorney and client is fiduciary in character and the attorney is held to the utmost good faith in the discharge of his duties. *Cultra v. Douglas*, 60 Tenn.App. 116, 444 S.W.2d 575 (1969); *Coleman v. Moody*, 52 Tenn. App. 138, 372 S.W.2d 306 (1963).

Prior to the drafting of the letter of credit, the bank had adopted a resolution [4] employing Bone and Woods as counsel for the bank but, as the chancellor determined, the bank "did not communicate this to the Law Firm of Bone and Woods who had no knowledge thereof and received no benefits of said resolution employing the Law Firm." The evidence establishes Bone and Woods was telephoned and requested to perform a routine legal service, *i.e.*, to draft the letter of credit. The request was made by Frank Woods, who was authorized to request the document. The second letter of credit as redrafted was performed by the attorneys for the Fitch family after a settlement was reached with the bank through Frank Woods. Bone and Woods did not participate in the settlement negotiations.

Bone and Woods insists that it was unnecessary for the firm to disclose any potential conflict of interest to the bank when the firm was called upon to draft the document by a bank executive who possessed more knowledge about the transaction than did the members of the firm. More importantly, the firm argues that it was not acting as general counsel for the bank but merely performed a routine task of drafting and only a tenuous connection existed between the firm's acts and the bank's loss.

■ The mere existence of an inter-relationship between two clients does not in and of itself create a conflict of interest disqualifying a law firm. Rather, a firm may limit its representation so as to avoid conflicts of interest. *In re H & S Transp. Co.*, 53 B.R. 128 (Bankr.M.D.Tenn.1985). The evidence establishes Bone and Woods did not simultaneously represent conflicting interests. The firm's representation of the bank was limited to specific legal tasks of a routine nature which it was requested to perform. The firm did not represent the bank in any matter wherein an actual conflict of interest arose. Accordingly, we concur with the chancellor's conclusion that the law firm is not liable for any loss suffered by the bank as the result of the

---

4. The bank had become a member of the United Southern Bank Co-operative which would provide members legal services through the law firm.

issuance of the letter of credit to C.H. Butcher, Jr.

The remaining issues are found to be without merit, and for the foregoing reasons the judgment of the chancery court is affirmed at appellants' cost.

TODD, P.J., and CANTRELL, J., concur.