974 F.2d 1339
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
In re WASHINGTON MANUFACTURING COMPANY; KSA, Inc.; and
Washington Industries, Inc., Debtors.
Ronald R. PETERSON, Trustee in Bankruptcy for Debtors as
Successor to Timothy F. Finley, Plaintiff-Appellee,
v.
HAMBLETON HILL INDUSTRIES, INC.; William R. Moore
Development, Inc.; E & W Building Venture; and Francis J.
Cianciola, Jr., and George M. Klepper, III, Trustees for
Sovran Bank/Memphis, Defendants-Appellants,
John W. Stapp, IV, Trustee for BM Enterprises, LTD and
Carnation Properties Corporation, Defendant.
 No. 91-6183.
 United States Court of Appeals, Sixth Circuit.
 Sept. 8, 1992.
 
 Before RALPH B. GUY, Jr. and RYAN, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendants, Hambleton Hill Industries, Inc. ("HHI"), William R. Moore Development, Inc., E & W Building Venture, Francis J. Cianciola, Jr., George M. Klepper and John W. Stapp appeal the district court's order reversing the bankruptcy court's decision that the sale of property by the debtor, Washington Manufacturing Company to the defendants was not voidable as a self-interested transaction under Tenn.Code Ann. § 48-1-816(a).
 
 I.
 
 2
 This case is related to the bankruptcy proceedings of Washington Manufacturing Co., KSA, Inc., and Washington Industries, Inc. Washington Manufacturing is a wholly-owned subsidiary of Washington Industries which is a wholly-owned subsidiary of HHI. The Boards of Directors of all three corporations are identical.
 
 
 3
 On September 30, 1986, Washington Manufacturing purchased the Ely & Walker Building from Washington Industries as part of a corporate reorganization. The parties to the reorganization valued the building at $6,000,000, the price at which it had been appraised on July 25, 1986. Citicorp Industrial Credit, Inc. ("Citicorp") provided a significant portion of the capital necessary for the reorganization. As a part of the credit arrangement, Citicorp required that $14,000,000 be repaid by Washington Manufacturing within approximately one year. To obtain the necessary cash, Washington Manufacturing was required to sell certain properties, one of which was the Ely & Walker Building in which Citicorp had a security interest.
 
 
 4
 When Washington Manufacturing attempted to sell the building, it found little interest. The only offer received during the winter and spring was an offer by Pitts for $3,000,000 made on March 24, 1987; Washington rejected this offer. Under pressure from Citicorp to obtain cash, Washington leased the building beginning in June 1987. At this point, directors Hill and Hambleton, and Young, a vice-president of Washington Industries, began to take the necessary steps to purchase the building themselves. On June 29, 1987, Commerce Union Bank issued a commitment to loan them $4,250,000 to purchase the building. These three formed a partnership, E & W Building Venture, on July 8, 1987 for the purpose of purchasing the building. At some subsequent date, which is not in the record, BM Enterprises apparently joined E & W Building Venture.
 
 
 5
 Neither the identity of the members of the E & W Building Venture nor the fact that the transaction would be an interested one was kept from the other directors. In a June 1987 letter, Hill disclosed the possibility of the transaction to directors Bigio, Muller, Shillo, and Giniger. On July 7, 1987, McElroy, who also was the legal counsel for Washington, sent a proposed purchase agreement to Citicorp for its approval. On that same date, McElroy telecopied the proposed purchase agreement to Giniger in Israel along with notice that a telephonic directors' meeting would be held the next morning. The proposed purchase agreement listed the partners of E & W Building Venture as being Hill, Hambleton, and Young.
 
 
 6
 On July 8, 1987, there was a telephonic directors' meeting. Except for Bigio, all of the directors were in attendance at the meeting in person or via a conference telephone call. Bigio was traveling in Europe at the time and was not informed of the meeting. At this meeting, the directors discussed the proposed purchase agreement which they had received the prior day; apparently, none of the directors had any objections and they all gave their approval to the transaction. No minutes of the meeting were kept to substantiate the topics discussed or the votes of the directors.
 
 
 7
 The transaction was closed on July 10. It was approved by Citicorp on July 13. The purchase price was $4,250,000. Washington paid the purchase costs which totalled $114,067.88; thus, Washington's net proceeds from the sale were $4,135,932.12.
 
 
 8
 On or about July 27, Hill received an offer of $4,900,000 for the building from Pitts. Hill did not disclose the existence of this offer to the other directors except to his partner, Hambleton. Apparently, none of the disinterested directors became aware of Pitts' offer until mid-August. No mention of the offer was made at a regular meeting of the directors which took place on August 4 and 5, even though the sale to E & W Building Venture was thoroughly discussed and ratified at the meeting.
 
 
 9
 On September 1, 1987, E & W Building Venture (which now included BM Enterprises as a partner) entered a contract with Pitts for the sale of the building. The transaction was completed on October 15, 1987. The sale price paid was $5,175,000. After paying off its loan with Commerce Union (including the 4% prepayment penalty), E & W Building Venture's profit from the sale was $685,731.11. To minimize adverse income tax consequences, the partners agreed to keep $150,000, $37,500 each; the remainder, $535,731, was injected as capital into HHI.
 
 
 10
 On March 1, 1988, Washington Manufacturing, KSA, and Washington Industries filed voluntary petitions under Chapter 11 of the Bankruptcy Code. The trustee in bankruptcy initiated the instant action to recover damages totalling $945,559.36 plus prejudgment interest from HHI and E & W Building Venture. The trustee's basis for this claim was that the sale of the Ely & Walker Building to E & W Building Venture was an avoidable self-interested transaction under 11 U.S.C. § 548 or, alternatively, under § 544 (allowing the trustee to use Tennessee's fraudulent conveyance or self-interested transaction laws).
 
 
 11
 In its January 18, 1991 decision, the bankruptcy court held that the transaction was not avoidable under Tennessee Code Annotated § 48-1-816 because it was fair and equitable to Washington and, alternatively, because the interested transaction was authorized by its board of directors. Therefore, the bankruptcy court denied relief to the trustee on all counts.
 
 
 12
 The trustee appealed the bankruptcy court's judgment to the United States District Court for the Middle District of Tennessee. The district court reversed the bankruptcy court's judgment as to Tenn.Code Ann. § 48-1-816, in a memorandum and order dated August 7, 1991. The district court held that the July 8 "meeting" of Washington's directors was deficient and, therefore, failed to authorize the sale of the building to E & W Building Venture at that time. It also held that the August 4 ratification was deficient because the interested directors failed to inform the uninterested directors of the substantially higher offer by Pitts.
 
 
 13
 The district court denied the defendants' motion for rehearing on August 19, 1991. Consequently, the defendants filed a timely notice of appeal from the district court's order on October 3, 1991.
 
 II.
 
 14
 Defendants argue that the district court erred in voiding the sale between Washington and the E & W Venture because at the time the sale was authorized by the board (July 8, 1987), the Pitts group offer had not yet been made, and therefore it had no effect on the validity of the board's deliberations. Additionally, they argue, the August 4 formal board meeting merely ratified the earlier board's authorization of the sale to E & W Venture. Therefore, they contend that the insider defendants had no duty to disclose the Pitts group offer since the transaction had already been authorized on July 8. The bankruptcy court essentially agreed with this analysis in its January 28, 1991 opinion.
 
 
 15
 The trustee argues, however, that no formal authorization took place on July 8. In fact, there is no evidence that the subject of the E & W Venture ever came up on July 8. Furthermore, the trustee argues that even if a telephonic board meeting was held on July 8, it did not comply with the corporate formalities required by Tennessee law. Therefore, any action taken at the July 8, 1987 meeting was of no force and effect. Instead, the trustee argues that actual approval occurred on August 4, 1987 at the board's formal meeting. At that time, the Pitts group offer had been made and therefore disclosure was required to validate the transaction. The district court employed similar analysis in reversing the bankruptcy court's order.
 
 
 16
 It is well settled that in an appeal from a district court's review of a bankruptcy court's decision, we independently review the bankruptcy court's decision. In re Flo-Lizer, Inc., 946 F.2d 1237, 1240 (6th Cir.1991). However, we are without authority to make independent findings of fact, In re Caldwell, 851 F.2d 852, 857 (6th Cir.1988), and review the bankruptcy court's fact-findings under the clearly erroneous standard of review. See Archer v. Macomb County Bank, 853 F.2d 497, 499 (6th Cir.1988); Bankruptcy Rule 8013. However, we review a bankruptcy court's conclusions of law under the de novo standard. In re Caldwell, 851 F.2d at 857.
 
 
 17
 Tennessee Code Annotated § 48-1-816(a) states that a transaction in which an officer or director has a personal interest is void or voidable unless:
 
 
 18
 (1) The material facts as to his interest and as to the transaction are disclosed ... and the fact of such interest is noted in the minutes, and the board ... authorizes, approves or ratifies the transaction by a vote sufficient for such purpose without counting the vote of the interested director or directors; or ...
 
 
 19
 (3) The transaction is fair and equitable as to the corporation at the time it is authorized or approved, and the party asserting the fairness of the transaction establishes fairness.
 
 
 20
 Tenn.Code Ann. § 48-1-816(a) (1984).
 
 
 21
 Thus, in the present case, the sale to E & W Venture can be approved under subsection (1) if the July 8 meeting was duly conducted and a majority of disinterested directors authorized the sale in accordance with the requirements of that subsection; the transaction would be deemed valid as of that date, irrespective of the later offer from Pitts. Secondly, under subsection (3), even if the transaction was not authorized as provided in subsection (1), the sale may be upheld if its terms are "fair and equitable to the corporation at the time it is authorized or approved."[1] Resolution of this question will turn on when the transaction was authorized or approved, as that is the time when fairness must be evaluated.
 
 A.
 
 22
 The defendants contend that the disputed transaction was authorized for the first time at the July 8 telephonic board meeting. The district court rejected this argument, ruling that the meeting did not comport with Tenn.Code Ann. § 48-1-808(b) or (c). In short, subsection (b) of this section provides that special meetings must be preceded by notice sent to each director. Subsection (c) authorizes telephonic meetings of the board of directors, provided that all directors are promptly furnished with minutes of the meeting. In the present case, defendants allege that a telephonic meeting was conducted on July 8 which comported with section 48-1-808. However, the events of early July 1987 demonstrate that this meeting was not conducted in accordance with law.
 
 
 23
 First, section 48-1-808(b) requires that any special meeting of the board of directors be preceded by a notice sent to all board members at least five days before the meeting. In our case, Mr. McElroy sent a single letter, the day before the meeting, which was to serve as notice to all the directors. This was clearly inadequate under the statute. However, as the district court acknowledged, all the directors of Washington, except Bigio, attended the July 8 meeting. According to the express terms of section 48-1-808(b), any defect in notice is waived by the directors attendance at the meeting. Therefore, the defective notice will not invalidate the meeting with respect to the directors in attendance; however, this does not excuse the inadequacy of notice to Mr. Bigio, who was not in attendance at the meeting.
 
 
 24
 Defendants counter that failure to notify Bigio of the directors meeting was not fatal, as notice was excused because Bigio was inaccessible or because he would have been disqualified from voting in any event because he had a personal interest in the transaction. However, it appears that Bigio was not an interested director as of July 8, as the record points out that he became a partner in E & W Venture sometime after the Venture was formed. Since the venture was formed on the same date as the telephonic directors' meeting, it is likely that Bigio was not interested at the time of the meeting, and so notice was required.
 
 
 25
 Likewise, in our view, defendants' argument that Bigio was inaccessible does not excuse proper notice. Although Bigio was traveling through parts unknown at the time of the meeting, the statute does not state that the director must receive notice, but only states that notice must be sent. Bigio's unavailability is irrelevant to the question of whether notice was properly sent.
 
 
 26
 The July 8 meeting may be flawed for an additional reason. Section 48-1-808(c) provides that at the conclusion of a telephonic meeting, the directors "shall be promptly furnished a copy of the minutes" of the meeting. This was not done in the instant case. The corporate minute book contained no evidence of the events of the July 8 meeting. The bankruptcy court excused this requirement because it held that a resolution adopted at this meeting had the same effect as corporate minutes. We disagree. There was no written evidence of what transpired at the July 8 meeting. Since the purpose of minutes, especially in the context of interested director transactions, is to create a tangible record of board meetings where there is the potential for fraud and self-dealing, we believe that the corporate minutes requirement should be strictly adhered to. Therefore, we conclude that, as a matter of law, the July 8 telephonic meeting did not comply with the minutes requirement of section 48-1-808(c).
 
 B.
 
 27
 Likewise, the board action taken at the August 4 meeting did not serve to validate the interested director transaction, because the interested parties failed to disclose all material facts to the board. Prior to the August 4 meeting, E & W Venture became aware of the Pitts group offer to purchase the building for $4.9 million. Since this was not disclosed to the board, Tenn.Code Ann. § 48-1-816(a)(1) would not validate the transaction even if approved by a majority of the disinterested directors.
 
 
 28
 However, even if an interested transaction is not authorized according to section 48-1-816(a)(1) it may nevertheless be validated under subsection (3) of that section if it was fair and equitable to the corporation. As the following discussion demonstrates, however, the transaction cannot be saved by the defendants' resort to this subsection.
 
 C.
 
 29
 Defendants contend that should this court find flaws in the July 8 meeting sufficient to render the board's action invalid, the sale to E & W Venture must be upheld under subsection (3). That subsection provides that a transaction in which an officer or director has a personal interest is void or voidable unless "the transaction is fair and equitable as to the corporation at the time that it was authorized or approved." Tenn.Code Ann. § 48-1-816(a)(3) (emphasis added). The main point of contention under subsection (3) is when the transaction should be evaluated to determine fairness.
 
 
 30
 Defendants argue that the transaction's fairness must be evaluated as of July 8 because that is when the transaction was authorized "in fact." Defendants argue that, for valuation purposes, it is irrelevant that that transaction may not have been formally authorized on July 8 (or, authorized "in law," to use defendants' terminology); rather, subsection (3) only requires the court to measure fairness when the transaction was authorized "in fact."
 
 
 31
 The trustee counters that fairness must be measured at the time the interested transaction is actually authorized or approved, in this case, on August 4. The trustee contends that subsection (3) was not designed to excuse all corporate formalities, such as proper notice or corporate minutes, and thus the time that a transaction is "authorized or approved" must be read with reference to the other sections of the Tennessee Code governing corporate formalities. See, e.g., Tenn.Code Ann. 48-1-808.
 
 
 32
 The issue of when to measure fairness is critical in this case because of the timing of the Pitts group offer. If fairness is evaluated as of July 8, prior to the Pitts offer, the transaction would be evaluated without regard to the higher offer. However, if fairness is analyzed on August 4, it must be evaluated in light of the prior Pitts group offer, which was $650,000 higher than E & W Venture's offer.
 
 
 33
 We note, however, that the case law does not support defendants' reading of the statute which creates a dichotomy between approval "in fact" and approval "in law." Defendants refer to a number of Tennessee cases, none of which strictly support their interpretation of the statute. For example, in In re Omni Mechanical Contractors, Inc., 114 B.R. 518 (Bankr.E.D.Tenn.1990), the court held that fairness should be evaluated at the time that the contract was entered into. Id. at 538. Omni, is inapposite because in that case the contracting party had the authority to enter into agreements on behalf of the corporation. Defendants do not contend that Hill had authority to enter into the contract irrespective of prior authorization from the board of directors. Therefore, we cannot use the time the contract was entered into as our benchmark because there was no prior board approval. For similar reasons, Old Folks Mission Center v. McTizic, 631 S.W.2d 433 (Tenn.App.1981); Fitch v. Midland Bank & Trust Co., 737 S.W.2d 785 (Tenn.App.1987); Tennessee Dressed Beef v. Hall, 519 S.W.2d 805 (Tenn.App.1974), do not address the question of when an evaluation for fairness under subsection (3) should take place.
 
 
 34
 In the absence of any clear guidance from the Tennessee courts, we believe that our analysis should be animated by the plain meaning of the statute. Federal Express Corp. v. Tennessee State Bd. of Equalization, 717 S.W.2d 873, 874 (Tenn.1986). The statutory section before this court on review provides that an interested director transaction will be upheld if "the transaction is fair and equitable as to the corporation at the time it is authorized or approved." Tenn.Code Ann. § 48-1-816(a)(3). As used in this subsection, "authorized or approved" means corporate authorization or approval as defined by Tennessee law. Thus, these terms have meaning only with reference to the provisions of the Tennessee Corporations Act which govern authorization or approval.
 
 
 35
 Although section 48-1-816(a)(3) will validate an interested director transaction even if certain procedures are not followed, see Tenn.Code Ann. § 48-1-816(a)(1) (disclosure of interest and vote of disinterested directors) we do not believe that subsection (3) should be read to abrogate all formalities associated with the approval or authorization of corporate transactions--especially those spelled out in other sections of the Tennessee corporation statute.
 
 
 36
 Therefore, for the purposes of determining when the fairness of a transaction should be evaluated, the reference to "the time that the transaction was authorized or approved" in subsection (3) should be read to require "approval" under Tennessee law. As we read the statute, the fairness of the sale to E & W Venture should be measured as of August 4, 1987 because that is the date that the transaction was approved and would have been upheld under Tennessee law but for the inside directors' failure to disclose the Pitts group offer.
 
 
 37
 Since the transaction was not approved until August 4, our final inquiry is whether that transaction was "fair and equitable" to the corporation within the meaning of Tenn.Code Ann. § 48-1-816(a)(3). In the present case, we believe that the transaction is not fair simply because the inside directors were aware of the higher Pitts group offer, and yet failed to disclose it before the directors gave their approval on August 4. See Old Folks Mission Center v. McTizic, 631 S.W.2d 433, 436 (Tenn.App.1981) ("By definition, active fraud undermines any pretense of fairness."). Not only does the higher offer demonstrate that E & W Venture did not give adequate consideration for the building, but also exhibits less than good faith conduct. See Omni Mechanical, 114 B.R. at 539 (the good-faith conduct of the parties is relevant to the question of whether the transaction was fair and equitable). Although E & W Venture's actions may not have risen to the level of fraud, we nevertheless believe good-faith required, at a minimum, that E & W Venture disclose this offer at the August 4 meeting. Indeed, Mr. McElroy testified that he would not have approved the sale had he known about the higher offer.
 
 
 38
 Therefore, as of August 4, we believe it is clear that the sale was not fair to the corporation and should not be validated under Tenn.Code Ann. § 48-1-816(a)(3).
 
 III.
 
 39
 For the foregoing reasons, the bankruptcy court's decision is hereby reversed, and this case is remanded to the bankruptcy court for further proceedings consistent with this opinion.
 
 
 40
 RALPH B. GUY, Jr., Circuit Judge, dissenting.
 
 
 41
 After conducting a trial, the bankruptcy court in this case concluded that the July 8 telephonic board meeting effectively authorized or approved the sale of the Ely and Walker Building to the interested directors and that the sale was fair to the corporation at that time. In overturning those conclusions, the court holds that the sale was not authorized or approved on July 8 because the meeting failed to follow certain corporate formalities. Since I believe that the absence of those corporate formalities does not invalidate the board's action, I respectfully dissent.
 
 
 42
 The majority concludes that the July 8 meeting was legally ineffective for two reasons. First, Gilbert Bigio, one of the directors, did not receive notice of the meeting and did not waive notice by attending. Second, no minutes of the meeting were kept.
 
 
 43
 There appears to be no disagreement that the failure to notify an interested director of a meeting at which a self-interested transaction is approved does not nullify the transaction. See State ex rel. Howeth v. D.A. Davidson & Co., 163 Mont. 355, 517 P.2d 722, 727 (1973); 2 William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 413. The rationale behind this rule is that, since an interested director would be disqualified from voting on his own transaction, failure to notify him is of no consequence. The court concludes, however, that Bigio was not interested on July 8 because his company, BM Enterprises, did not become a partner in the venture until after July 8. However, the record indicates that Sam Muller telecopied a letter to Hill on July 7, in which Muller indicated that BM Enterprises would participate in the self-interested transaction. Therefore, Bigio was interested by July 8, and the failure to notify him should not be not fatal to the sale.
 
 
 44
 The failure to keep minutes of the July 8 meeting also is fatal to this transaction according to the court's analysis. I have been unable to find any authority in support of this proposition, and the majority cites to none. On the contrary, the authority I have found concludes that the failure to keep minutes does not invalidate the actions taken at a director's meeting. See, e.g., In re Omni Mechanical Contractors, Inc., 114 B.R. 518, 540 (Bankr.E.D.Tenn.1990) (applying Tennessee law); In re B-F Bldg. Corp., 284 F.2d 679, 681 (6th Cir.1960) (applying Ohio law); 9A Fletcher, supra, § 4659.[1]
 
 
 45
 Accordingly, I believe that the board effectively acted on July 8 when it unanimously approved the self-interested sale. The deed used to consummate the sale two days later further supports that conclusion. That deed was drafted by James McElroy, the disinterested director who testified for the trustee at trial. The language in the deed recited that Hill was "authorized" to sell the building to the self-interested directors. The court concludes, however, that the lack of minutes and Bigio's absence means that the transaction was not "authorized or approved" on July 8. I disagree with this conclusion for two reasons. First, as I have indicated above, I would find that Bigio's absence and the failure to keep minutes were of no consequence to the effectiveness of the meeting.
 
 
 46
 Second, I believe that voiding the sale because certain corporate formalities were missing runs counter to the intent of Tenn.Code Ann. § 48-1-816(a). That section provides three distinct ways to save a self-interested transaction. Subsections (1) or (2) will save the transaction if disinterested directors approve the transaction in a meeting in which certain formalities are observed or if disinterested shareholders vote to approve the transaction. Alternatively, subsection (3) will save the transaction if it "is fair and equitable as to the corporation at the time it is authorized or approved...."
 
 
 47
 I emphasize that section 48-1-816(a) is written in the disjunctive. I believe that the use of the disjunctive is a clear indication that the corporate formalities required to save the transaction under subsection (1) are not necessary to save the transaction under subsection (3), so long as the transaction is fair to the corporation at the time of approval. Since subsection (1) saves the transaction if formalities are observed, reading subsection (3) to require observance of the same formalities renders that subsection redundant and meaningless.
 
 
 48
 Only three published opinions have analyzed the fairness provision of section 48-1-816(a), and none of the three provides support for the majority's reading. In Tennessee Dressed Beef Co. v. Hall, 519 S.W.2d 805 (Tenn.Ct.App.1974), the corporation awarded a contract to another company owned by two of the corporation's directors. The plaintiff shareholders brought suit against the two directors, alleging that the directors reaped "secret profits" through the arrangement. Id. at 806. The court upheld the chancellor's determination that, although the arrangement was "unhealthy," the transaction was saved by subsection (3) of section 48-1-816(a) because the contract was fair to the corporation. Id. at 809-10.
 
 
 49
 Tennessee Dressed Beef is particularly relevant to this case because the Tennessee Court of Appeals approved the sale under subsection (3) even though the shareholders in that case pointed out that no meeting was held to approve the sale.[2] If a self-interested transaction can be adjudged fair even though no meeting of any description was held, certainly one can be adjudged fair when a meeting is held and certain corporate formalities are neglected.
 
 
 50
 Similarly, another bankruptcy court in Tennessee recently reached the same conclusion. Omni Mechanical Contractors, 114 B.R. at 540. In Omni Mechanical Contractors, the court held that the absence of corporate minutes does not preclude self-interested directors from establishing the fairness of a transaction under subsection (3) of section 48-1-816(a). As the court explained, a trustee is not entitled to void a self-interested transaction under subsection (3) "due to a lack of corporate formality." Id.
 
 
 51
 Finally, in Old Folks Mission Center v. McTizic, 631 S.W.2d 433, 437 (TennCt.App.1981), the court held that a director could not prove the fairness of a self-interested transaction because he had engaged in "active fraud" against the corporation. McTizic is not helpful to evaluate the July 8 meeting because there has been no finding that the directors engaged in fraud against the corporation.
 
 
 52
 In summary, I believe that Bigio's absence and the lack of minutes were of no consequence to the effectiveness of the July 8 meeting. Even if these formal shortcomings amounted to major defects, I believe that section 48-1-816(a)(3) would still require that the fairness of the transaction be evaluated as of July 8. Therefore, I would reverse the decision of the district court and reinstate the decision of the bankruptcy court.
 
 
 
 [1]
 "Authorization" or "authorize," as defined by Black's Law Dictionary and as used in this decision, means "to permit a thing to be done in the future." BLACK'S LAW DICTIONARY 122 (5th ed. 1979). By contrast, "approval" or "approve" means the act of confirming, ratifying, assenting, sanctioning or consenting to some act or thing [already] done by another." Id. at 94
 
 
 [1]
 Of course, the existence or non-existence of minutes has great evidentiary value if a dispute later arises over what transpired at the meeting. In this case, however, the bankruptcy court concluded from the testimony and other evidence before it that all of the directors present on July 8 voted in favor of the self-interested sale. That factual finding has not been appealed
 
 
 [2]
 This fact is not found in the opinion in Tennessee Dressed Beef, but the shareholders emphasized in their brief to the court the fact that no meeting had been held