**B & L CORPORATION d/b/a U.C. Consultants, Plaintiff/Appellant,**

v.

**THOMAS & THORNGREN, INC., Stephen L. Thomas, Kris R. Thorngren, Jean L. Donnelly, and Gwen L. Benson, Defendants/Appellees.**

Court of Appeals of Tennessee,
Middle Section, at Nashville.

Aug. 25, 1995.

Permission to Appeal Denied by
Supreme Court Feb. 26, 1996.

J. Michael Jacobs, Steven B. McCloud, Jacobs & Holt, PC, Nashville, for appellant.

Robert E. Boston, James Holt Walker, Waller Lansden Dortch & Davis, Nashville, for appellees.

## *OPINION*

LEWIS, Judge.

This is an appeal by Plaintiff U.C. Consultants Inc., from the judgment of the trial court granting Defendant Kris Thorngren's motion for summary judgment. The Plaintiff's suit involves a claim that Thorngren violated a covenant not to compete, breached fiduciary duties, converted U.C. Consultants property, unfairly competed, and benefited from unjust enrichment. The Davidson County Chancery Court decided however, that the employment agreement signed by Thorngren had expired and awarded him attorney's fees.

The Plaintiff/Appellant presented the following issues for our consideration:

I. Whether the Chancellor committed reversible error in holding that the non-competition provision of Mr. Thorngren's employment agreement had expired before his departure from the employ of U.C.

II. Whether there were genuine issues of material fact present such that the Chancellor committed reversible error in granting Defendant Thorngren's motion for summary judgment on all issues contained within Plaintiff's complaint and against Plaintiff on Mr. Thorngren's counterclaim.

III. Whether the Chancellor committed reversible error in awarding Mr. Thorngren attorney's fees and costs.

### *FACTS*

Appellant U.C. Consultants ("U.C.") is a Tennessee Corporation chartered in 1981 providing unemployment cost control consultation. Mr. Michael Brodbine organized the corporation and has been the company's primary manager since its inception. On July 8, 1982, U.C. hired the Appellee, Kris Thorngren. On that date Thorngren executed an employment agreement with U.C. that provided in relevant part:

### I.

#### *Employment and Duties*

The Corporation hereby agrees to continue to employ the Employee and Employee hereby accepts such employment as an employee of the Corporation.

### II.

#### *Term of Employment*

The term of Employee's employment hereunder commenced on the 8th day of July, 1982, and shall continue thereafter for a period of one (1) year.

### IV.

#### *Covenants and Conditions*

A. ... Accordingly, Employee agrees that he shall not at any time use for himself or disclose to any other person not employed by the Corporation any such knowledge or information heretofore acquired or acquired during the term of this agreement.

### VII.

#### *Covenant Not to Compete*

In consideration of this one year employment agreement, Employee hereby agrees that during the term of his employment by the Corporation and for a period of (3) three years after the termination of said employment, Employee will not be employed by or serve as a consultant to or in any other capacity engage in business of unemployment tax compensation consultation with any clients past or present of the Corporation.

### X.

#### *No Oral Modification—Entire Agreement*

This Agreement constitutes the full and complete understanding and agreement of the parties, supersedes all prior understandings and arrangements as to the employment of the Employee, and cannot be amended, changed, or modified without the consent in writing of the Corporation and the Employee.

### XI.

#### *Binding Upon Heirs and Attorney Fees*

This Agreement shall inure to and be binding upon the executors, administrators, or

personal representatives of Employee and the Corporation's assigns or successors in interest. Should it become necessary to enforce any of the terms, provisions, or obligations assumed in this Agreement, the guilty party shall pay the other party's reasonable attorney's fees incurred as a result of said action.

Thorngren worked for U.C. Consultants from July 8, 1982 to January 4, 1994, eventually becoming a Vice President and one of three U.C. operating executives. Thorngren never was a U.C. shareholder.

In late 1992, Michael Brodbine approached Mr. Thorngren and Steve Thomas, another U.C. executive. Brodbine discussed the possibility of the U.C. employees buying U.C. from the Brodbine's using an employee stock ownership plan.[1] Subsequently, Thorngren and Thomas began taking steps to purchase U.C. Consultants themselves, rather than using the employee stock ownership plan.

In anticipation of their new venture Thorngren and Thomas made offers of employment to two existing U.C. Consultants employees, Gwen Benson and Jean Donnelly. Thorngren and Thomas made the offers between July and October of 1993. Later in December of 1993, Thorngren and Thomas signed a lease for office space, arranged telephone service, and acquired some office equipment in preparation for their new enterprise.

On January 4, 1994 Thomas and Thorngren approached Mr. Brodbine with an offer to buy the company. Brodbine refused and Thorngren and Thomas left U.C. Consultants' offices. It is unclear whether Brodbine fired Thorngren and Thomas, or whether they quit.

U.C. Consultants commenced an action on January 26, 1994, alleging violation of the non-compete covenant, breach of fiduciary duty, conversion, unfair competition, and unjust enrichment. The Davidson County Chancery Court determined that the non-competition clause signed by Thorngren expired no later than July 8, 1986. On August 4, 1994, the trial court granted a summary judgment for Thorngren, and awarded him attorney's fees.

## SUMMARY JUDGMENT

In 1993 the Supreme Court espoused the proper summary judgment analysis in Tennessee in *Byrd v. Hall*, 847 S.W.2d 208 (Tenn.1993). In *Byrd v. Hall* the Supreme Court stated that Tennessee's summary judgment rule, Rule 56:

> was implemented to enable courts to pierce the pleadings and determine whether the case justifies the time and expense of trial; that the party seeking summary judgment must carry the burden of persuading the court that no genuine issue of material fact exists; that the non-moving party must affirmatively demonstrate with specific facts that there is indeed a genuine and material factual dispute; that the court must view the evidence in favor of the non-moving party and allow all reasonable inferences in his favor; that the trial judges are not to weigh the evidence; that the critical facts are those deemed "material" under the substantive law governing the case; and that summary judgment is to be used only when the resolution of the case depends upon the application of legal principal, such that there is nothing to submit to the trier of fact to resolve in favor of one party or the other.

*Byrd*, 847 S.W.2d 208, 214.

The Supreme Court further explained that "the issues that lie at the heart of evaluating a summary judgment motion are: (1) whether a *factual* dispute exists; (2) whether the disputed fact is material to the outcome of the case; and (3) whether the disputed material fact creates a *genuine* issue for trial." *Id.* Therefore, to decide whether summary judgment was appropriate here, we must follow the guidelines the Court set forth.

We must first scrutinize the evidence to determine whether a factual dispute exists. If we find that "there is no dispute over the evidence establishing the facts that control the application of a rule of law, summary

---

1. An employee stock ownership plan is a vehicle to transfer ownership of a business to its employ-ees via a gradual sale of the stock of the company.

judgment is appropriate." *Id.* at 215. Finally, if we find a disputed, material fact, we must determine whether it creates a genuine issue for trial. *Id.* The Supreme Court defined the test as "whether a reasonable jury could legitimately resolve [the] fact in favor of one side or the other." *Id.* If a jury could not do so, "summary judgment is proper because a trial would be pointless as there would be nothing for the jury to do and the judge need only apply the law to resolve the case." *Id.* Furthermore, in making this determination, we must review the evidence in a light most favorable to the non-moving party and allow all reasonable inferences in his favor. *Id.*

To make the foregoing determinations, we must examine the Appellee's claims.

### EXPIRATION OF THE NON–COMPETE COVENANT

■ The trial court held that Thorngren could not breach the covenant not to compete as a matter of law, stating, "the contracts speak for themselves, the contracts are ... clear, unambiguous and require no interpretation."

In Article I of the Employment Agreement, U.C. Consultants agreed to employ Mr. Thorngren. In Article II of the Agreement, U.C. Consultants set the term of Thorngren's employment as one year. In Article VII, the Covenant Not to Compete, the Agreement states:

> In consideration of the employment agreement, Employee hereby agrees that during the term of his employment by the Corporation and for a period of three years after the termination of said employment, Employee will not be employed by or serve as a consultant to or in any other capacity engage in the business of unemployment tax compensation consultation with any clients past or present of the Corporation.

In Article VII the phrase "during the term of his employment" logically seems to refer to the term in Article II, or one year, beginning July 8, 1982. Article VII goes on to require that Thorngren refrain from competing for 3 years after the "termination of said employment," the phrase "said employment" referencing the contract term, which was July 8, 1982 to July 8, 1983. The three year period that Thorngren was obligated to not compete in therefore ran from July 8, 1983 to July 8, 1986.

U.C. Consultants vigorously disputes this interpretation of the employment agreement. They contend that the period in which Thorngren could not compete began after Thorngren's employment with U.C. as opposed to the duration of the employment contract. This construction seems to depart from the Employment Agreement's terms.

■ Aside from the apparent mandate of the Employment Agreement, several tenets of Tennessee law require the interpretation given by the chancery court. First, non-competition contracts are construed favorably to the employee. *Allright Auto Parks, Inc. v. Berry,* 219 Tenn. 280, 409 S.W.2d 361 (1966). Also, as the drafter of the Employment Agreement U.C. Consultants must take responsibility for its allegedly ambiguous provisions. *Boatland, Inc. v. Brunswick Corp.,* 558 F.2d 818 (6th Cir.1977). U.C. Consultants could have clearly stated that the three-year covenant not to compete period began after Thorngren's departure from the company regardless of when he stopped working there. However, they did not and are thus faced with accepting the contract with its most evident meaning.

Thus, for the reasons stated above this court affirms the decision of the trial court and hold that the Employment Agreement expired by its own terms no later than July 8, 1986.

### BREACH OF FIDUCIARY DUTY

■ Thorngren, a vice-president and officer of U.C. Consultants, owed his employer a fiduciary duty. Practically this meant that Thorngren could not "assume positions of conflict with the interests of the corporation." *Hayes v. Schweikart's Upholstering Co.,* 55 Tenn.App. 442, 402 S.W.2d 472, 483 (1985). Also, Tennessee law requires an officer to discharge his duties in "good faith, with the care of an ordinarily prudent person in a like position would exercise under similar circumstances in a manner he believes to be in the best interests of the corporation." T.C.A.

§ 48–58–403. Whether Thorngren breached his fiduciary duty requires a detailed examination of the facts and law, making summary judgment a potentially inappropriate device. This Court has held that whether an officer properly discharges his duties is a question of fact to be determined in each case in view of all the circumstances. *Fitch v. Midland Bank & Trust Co.* 737 S.W.2d 785 (Tenn.Ct. App.1987).

Although Thorngren, or any employee, may prepare to compete with his employer before termination, Thorngren took several actions which suggest he may have wrongfully competed with his employer. These potentially impermissible acts include soliciting co-employees to join him in the competing enterprise, and contacting his employer's customers to "announce" Thorngren's new venture. Of course, any pre-termination solicitation of customers for the new competing business would violate Thorngren's duty of loyalty. Factually it would appear that Thorngren's contact did amount to solicitation as many of U.C. Consultants' former clients terminated agreements with U.C. after Thorngren departed his position. Thus the circumstances of Thorngren's "announcement" or advertisement merit inquiry to determine whether or not they constituted solicitation. Also of concern to the Court is the likelihood that Thorngren planned his new business for months on U.C. Consultant's time, using their telephones and other property.

The record contains sufficient evidence to create a genuine issue of material fact as to whether the defendants properly fulfilled their duties to U.C. Consultants. Thus, the issue is remanded to determine whether Thorngren's pre-termination contacts amounted to impermissible solicitation of both U.C. employees and existing clients.

█ Related to the breach of fiduciary duty claim is the Appellee's argument that there is a genuine issue of material fact with regard to Thorngren causing a breach of contract between U.C. Consultants and several former clients. U.C. utilized a form of contract which called for automatic renewal unless a client cancelled within sixty days of the anniversary date. At least one client, the Krystal Company, appears to have cancelled their contract with U.C. Consultants very soon after Thorngren's departure, and outside of the sixty day renewal window. However, whether Thorngren caused U.C. Consultant's contracts to be breached is more appropriately examined in the form of a breach of fiduciary duty inquiry and thus should be incorporated into that review upon remand.

## CONVERSION

█ Thorngren asserts that there is no genuine issue of material fact as to the conversion of tangible personal property belonging to U.C. Consultants. He relies only upon his affidavit in which he denied any wrongdoing. U.C. Consultants disputes Thorngren's denial and offers circumstantial proof. First, computer tapes belonging to U.C. were missing after Thorngren left U.C. Consultants. Secondly, Myrah Chandler, an employee of U.C. Consultants, states that on December 23, 1993, she saw Thorngren print a long document. Chandler believes the document was a list of all the companies that U.C. represents, along with other relevant information on these clients. She also noted that Thorngren was in U.C. offices at unusual hours during December 23 and 24. Standing alone Myrah Chandler's affidavit does not recall acts which constitute conversion. Additionally it is true that "the mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient" to defeat a summary judgment motion. *Byrd v. Hall*, 847 S.W.2d 208, 212 (Tenn. 1993). However, we must take the strongest legitimate view of the evidence in favor of U.C. Consultants, and allowing all reasonable inferences in their favor. In doing so we conclude that there is a genuine issue of material fact when one couples the missing items, Chandler's statements, and the timing of Thorngren's departure.

█ Next we consider U.C. Consultants contention that Thorngren converted intangible personal property. U.C. alleges that Thorngren, through skills developed while employed by U.C., has unlawfully converted U.C.'s business relationships with many of its clients. Consequently, U.C. is claiming con-

version of an intangible property right: U.C.'s interest in its business relationships.

However, it seems that the majority of courts do not recognize an action for the conversion of intangible property rights. In *H.J. Inc. v. International Tel. and Tel. Corp.*, a distributor sued a manufacturer, alleging among other things, tortious interference and that the manufacturer had converted its dealer network. *H.J. Inc., v. International Tel. and Tel. Corp.*, 867 F.2d 1531 (8th Cir.1989). The distributor's property interest in the dealer network was not evidenced by any document. *Id.* at 1548. The court there refused to expand Minnesota law to allow a claim of conversion of an intangible property interest in a business relationship. *Id.* The court also noted that the conversion claim amounted to an assertion that the manufacturer "stole" the distributor's good relationship with its dealers, which was nothing more than a way of restating its tortious interference claim. *Id.* at 1547, n. 12.

Similarly, in *Unlimited Screw Products, Inc. v. Malm*, a supplier sued a competitor alleging that the competitor had converted suppliers business relationship with a customer. *Unlimited Screw Products, Inc. v. Malm*, 781 F.Supp. 1121 (E.D.Va.1991). The supplier had no existing contract with the customer, but was on an "Acceptable Suppliers List." *Id.* at 1131. The court granted the competitor's motion for summary judgment on the conversion claim, noting that "it would seem preferable to fashion other remedies, such as unfair competition, to protect people from having intangible values used and appropriated in unfair ways." *Id.* (citing W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 15, at 92 (5th ed. 1984)).

Conversion is the appropriation of a chattel, i.e. tangible property. Black's Law Dictionary, 402 (4th Ed.1941). In contesting the conversion of its intangible property, chiefly its goodwill, U.C. Consultants has access to several historically recognized claims. In fact, U.C. Consultants argued several on appeal, namely breach of fiduciary duty, disclosure of confidential information, and unfair competition. Another potential claim not asserted by U.C. Consultants which would address similar conduct, is tortious interference with contractual relations. Failure to recognize the cause of action of conversion of intangible personal property does not preclude U.C. Consultants from a remedy. Given that there is no authority in Tennessee for this claim, and its minority status in other jurisdictions, we are inclined to affirm the decision below awarding summary judgment to Thorngren as to conversion of intangible property.

■ Related to U.C. Consultants claim of conversion is that of unjust enrichment. U.C. contends that Thorngren was unjustly enriched in that his alleged wrongful acts allowed him to usurp U.C.'s clients. The theory of unjust enrichment is "founded on the principle that a party receiving a benefit desired by him, under circumstances rendering it inequitable to retain it without making compensation, must do so." *Paschall's v. Dozier*, 219 Tenn. 45, 407 S.W.2d 150, 154 (1966). Hence, for U.C. to escape summary judgment on this issue, there must be genuine issues of material fact as to whether 1) U.C. conferred a benefit on Thorngren; 2) Thorngren appreciated the benefit; and 3) whether it would be inequitable for Thorngren to retain the benefit without paying for it. *Id.* 407 S.W.2d at 155.

■ Each case of unjust enrichment must be examined in light of its factual situation and decided according to the essential elements of unjust enrichment. *Id.* U.C.'s unjust enrichment claim appears to rest on Thorngren's alleged use of U.C.'s business techniques, and business property and confidential information. With regard to U.C.'s business techniques, that they represent a benefit conferred upon, and accepted by, Thorngren seems sufficiently supported by the record to raise genuine issues of material fact. For example, Thorngren himself testified that his technical skills increased as a result of his employment at U.C. Consultants. However, the question of whether it would be unjust for Thorngren to profit from skills acquired during his employment is best addressed as a fiduciary duty inquiry and, accordingly, should be incorporated into that review upon remand.

Like U.C.'s business techniques, the record seems to raise sufficient questions of fact about whether U.C.'s business property and confidential information were benefits conferred on, and accepted by, Thorngren. The Court has already noted its concern regarding the likelihood that Thorngren planned his new business using U.C.'s telephones and other property. The Court has also noted that there are genuine issues of material fact as to whether Thorngren has availed himself of U.C.'s confidential information concerning its customers to start a competing business. Given that Thorngren has since won over many of U.C.'s customers, this information arguably was a benefit to Thorngren.

 It can also be argued that Thorngren's retention and use of the information was unjust. One factor used to determine if retention is unjust is industry custom. *See W.F. Holt Co. v. A & E Elec. Co.,* 665 S.W.2d 722, 738–739 (Tenn.App.1983) (holding that a subcontractor's efforts to help a contractor obtain a bid were not compensable under a theory of unjust enrichment because the industry custom was that subconcontractors provided this type of service in the hope that they would be hired by the contractor, not in expectation of direct compensation). It is generally not customary for firms to give competitors confidential customer information without expectation of compensation. Industry custom, combined with the possibility that Thorngren may have obtained the confidential information by breaching his fiduciary duty, raise sufficient issues of material fact to warrant the remand of this issue to determine whether Thorngren retained U.C.'s business property and confidential information, and if so, whether this retention constituted unjust enrichment.

### DISCLOSURE OF INFORMATION; UNFAIR COMPETITION

 The Appellant U.C. contends that Mr. Thorngren is guilty of unfair competition by using certain confidential and proprietary information, including but not limited to customer lists, billing schedules, pricing, and account information learned while an officer of U.C. Specifically U.C. contends Thorngren's actions violate Article IV of the Employment Agreement entitled "Covenants and Conditions." While there can be no genuine issue of material fact as to violations of the Employment Agreement given its July 8, 1986 expiration, there still may be grounds for an unfair competition claim independent of the Agreement.

Unfair competition is a generic name for several related torts involving improper interference with business prospects. Prosser and Keeton on the Law of Torts § 130 at 1013 (5th ed. 1984). Although all unfair competition does not stem from a breach of a fiduciary relationship, the breach of a fiduciary relationship by an employee, using confidential information obtained while employed to the detriment of his employer, may constitute unfair competition. *Plastic Industries, Inc., v. Yarborough and Co.,* 1988 Tenn.App. LEXIS 742, C.A. No. 57, CIV.ACTION NO. 16, 108.

For many of the reasons already discussed in the fiduciary duty portion of this opinion we believe there to be a genuine issue of material fact regarding Thorngren's actions and remand this issue for greater examination.

### ATTORNEY'S FEES

U.C. Consultants argues that the chancery court committed reversible error in awarding Thorngren attorney's fees and costs pursuant to a provision in the original employment agreement. We agree. The employment agreement expired on July 8, 1986 and no longer governs the conduct of the parties. For an explanation of the expiration of the employment agreement see the foregoing treatment of that issue.

It therefore results that the judgment of the trial court is reversed, and the cause is remanded to the trial court for further proceedings consistent with this opinion. Costs on appeal are taxed to the defendants/appellees.

TODD, P.J., M.S., and CANTRELL, J., concur.