# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
August 7, 2002 Session

## MILL CREEK ASSOCIATES, INC.
### v.
## THE JACKSON FOUNDATION, INC.

**An Appeal from the Chancery Court for Dickson County**
**No. 7068-01      Leonard W. Martin, Chancellor**

---

**No. M2001-02811-COA-R3-CV - Filed March 11, 2003**

---

This is an unjust enrichment case. The plaintiff design firm was contacted by the defendant foundation to develop designs and a budget for the construction of a science theater. The chief designer of the firm worked on the project and presented a proposal to the foundation. The foundation neither accepted nor rejected the design firm's proposal. Instead, the foundation hired the design firm's chief designer. Part of the designer's duties with the foundation was to work on the science theater project "in house." The foundation refused to pay the design firm a fee for its work on the project. The design firm then sued the foundation on a theory of unjust enrichment for the work performed on the project while the chief designer was still at the firm. The trial court found that since the project was never completed, the preliminary designs did not confer a value on the foundation and, consequently, the foundation had not been unjustly enriched. The design firm now appeals. We reverse, finding that the work performed by the design firm constituted a benefit to the foundation, and that it would be unjust for the foundation to retain that benefit without paying the design firm for the value of the benefit.

### Tenn. R. App. P. 3  Appeal as of Right; Judgment of the Chancery Court is Reversed and Remanded

HOLLY KIRBY LILLARD, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Stephen C. Knight, Nashville, Tennessee, for the appellant, Mill Creek Associates, Inc.

Henry F. Todd, Jr., Dickson, Tennessee, for the appellee, The Jackson Foundation, Inc.

### OPINION

Plaintiff/Appellant Mill Creek Associates, Inc. ("Mill Creek"), is a design fabrication firm that produces displays for the museum, theater, retail, and trade show industries. It is owned by Sam Craig ("Craig") and Steve Landers ("Landers"). In August 1998, a representative of

Defendant/Appellee The Jackson Foundation, Inc. ("the Foundation"), contacted Mill Creek about designing and building a project for its new Renaissance Center facility[1] ("the Project"). The Project involved developing a depiction of a London street scene from the 1830's in a walkway that would lead into a science theater in the basement of the Renaissance Center. Robert Cooper ("Cooper"), Mill Creek's sole designer, worked with the Foundation on the Project. The Foundation solicited no other bids or proposals for the design or construction of the project.

Initially, Cooper met with Foundation representatives Douglas Jackson ("Jackson") and Robert Spencer ("Spencer") to discuss the Project. After the meeting with Jackson and Spencer, Cooper did preliminary design work, including research, collection of images, and planning. After that, Cooper went to another meeting at the Renaissance Center, this time with Steve Jacobs ("Jacobs"). Jacobs had created the idea for the Project. Cooper and Jacobs exchanged information, and Jacobs provided Cooper with the research Jacobs had conducted. Cooper then did further research and made sketches for the Project. By September 5, 1998, Cooper had spent about thirteen hours working on a proposal for the design and budget for the Project.

In Mid-November, Spencer called Cooper to check on where Cooper was in the "design phase" of the Project. After receiving that call, Cooper worked almost exclusively on the Project until December 2, 1998. On that date, he met with Spencer and Jackson to give the Foundation a packet that included preliminary design printouts, sketches, other related materials, and a budget. The proposal had a $460,000 budget, which included $400,000 in construction plus a 15% design fee for Mill Creek of $60,000.

Though Spencer and Jackson were pleased with how the design looked, they objected to the overall amount of the budget. They asked Cooper to redesign the Project using half of the proposed budget, or approximately $200,000. Consequently, Cooper, along with Landers and Craig, reworked the design to reduce construction costs. On December 16, 1998, Cooper met again with Spencer and Jackson. He gave them a revised packet on the design, along with a revised budget of $245,000, which included $213,000 in construction costs plus a 15% design fee of about $32,000. At that meeting, Cooper gave Spencer and Jackson a letter requesting 20% of the estimated design fee ($6,400) as a "retainer and payment . . . for our services to date." By the date of this meeting, Cooper had spent approximately 156 hours working on the Project and developing a budget. Spencer and Jackson told Cooper that they would present the new budget to the Foundation's board of directors for approval.

During the course of the December 16 meeting, Spencer and Jackson also asked Cooper if he would be interested in working directly for the Foundation and taking the Project "in house." Cooper initially declined. He later reconsidered, however, and was hired by the Foundation as its Senior Exhibit Designer on January 4, 1999. When Cooper left Mill Creek, he was given his research and designs on the Project.

---

[1]The Renaissance Center itself was opened to the public in August 1999.

After Cooper was hired by the Foundation, Mill Creek sent the Foundation a bill for $9,390, for 156.5 hours at $60 per hour, the amount of time Cooper spent working on the Project while he was still employed at Mill Creek. The Foundation did not pay Mill Creek for Cooper's work. On March 11, 1999, Spencer wrote Landers a letter stating:

> It was neither my nor Mr. Jackson's understanding that we had entered into an agreement for the production and design of the London street and theater. We had met with Mr. Cooper on two separate occasions to review what appeared to be preliminary sketches and conceptualization for this project. I assume this information was provided to allow us to make a decision concerning the services of Millcreek [sic].

Therefore, based on its position that there was no contract, the Foundation declined to pay Mill Creek for Cooper's services designing the Project while he was employed at Mill Creek.

The Foundation never formally accepted or rejected the December 16 proposal presented by Cooper on behalf of Mill Creek. The Foundation later completed a small part of the Project, but did not move forward with the bulk of it. Completion of the London street scene, however, remained under consideration, and completing the Project was "part of the list" of projects to which Cooper was assigned.

On June 16, 1999, Mill Creek sued the Foundation on claims of breach of contract, promissory estoppel, and unjust enrichment. Mill Creek asserted that the Foundation was liable to Mill Creek in the amount of $31,950, which was approximately 15% of the Project's projected budget for design services.[2] On August 29, 2001, the case was tried before the trial court, sitting without a jury.

At the trial, Cooper was the primary witness for both sides. Cooper testified as a witness for Mill Creek in its case-in-chief because Cooper was the agent for Mill Creek who dealt with the Foundation. Cooper, however, was also designated as the Foundation's expert witness and testified on its behalf as well.

In his testimony, Cooper said that he decided to leave his employment with Mill Creek because he was not made a partner with the firm.[3] He acknowledged that when he left he was given his research and design work on the Project, and said that he keeps these materials in his Foundation office at the Renaissance Center. Cooper testified that, at the time he was working on the Project at Mill Creek, Mill Creek had not entered into a contract with the Foundation. At that time, Cooper did not expect the Foundation to pay Mill Creek for his work unless the Foundation went forward

---

[2] Though the action was initially brought in Davidson County, the case was transferred to the Chancery Court for Dickson County on February 5, 2001.

[3] Cooper testified that he was offered a 4% partnership interest in Mill Creek, and that this was not a sufficiently large partnership interest to keep him there.

with the Project. Cooper said he was confident that, had the Foundation's board approved the project, the Foundation would have entered into a contract with Mill Creek to help develop it. He testified that he had completed 20% of the Project's design while he was at Mill Creek. When asked his opinion, Cooper said he thought that, after he became employed by the Foundation, the Foundation should have compensated Mill Creek for the work he had done on the Project while he was employed by Mill Creek. Cooper acknowledged that, when he was hired by the Foundation, the Project was on the list of duties assigned to him. When asked whether the Project had been constructed, Cooper said that the Foundation had "built a very small portion of the city street as an entrance into the science theater that resembles some of the work that had been done." Otherwise, he stated, the Project had not been constructed.

Landers testified on behalf of Mill Creek. Landers said that Cooper was the person who dealt with the Foundation on Mill Creek's behalf. Through Cooper, Landers understood that Mill Creek had been hired to design the Project. Landers knew, however, that the Foundation's board of directors had not yet approved the Project, and that such approval was necessary before it could be developed. Landers believed that over 50% of the design of the Project had been completed by Cooper while he was employed by Mill Creek.

Landers testified that Cooper resigned from Mill Creek to work for the Foundation with the understanding that Mill Creek would be paid for the design fees incurred while Cooper was at Mill Creek. Landers said, "[P]art of [the agreement with Cooper] was getting [Mill Creek] billed out for the due design fees now. And since he was going to work for the Jackson Foundation, he could pick it up from there. Everybody leaves on a clean slate." Based on that understanding, Landers permitted Cooper to take with him the designs and other materials related to the Project. Landers acknowledged sending the Foundation a bill for $9,390 after Cooper went to work for the Foundation. He explained that he sent the bill because the Foundation obviously would no longer need Mill Creek's services, in light of the fact that the lead designer on the Project had become employed by the Foundation. Because the overall budget had not been approved by the Foundation's board of directors, Landers thought that it was most logical to bill the Foundation for the hours worked, rather for a percentage of the design budget.

Finally, Spencer testified on behalf of the Foundation. Spencer said that Jacobs had the idea to turn the basement of the Renaissance Center into a science theater and to depict a London street scene in the entrance hallway. Spencer testified that, when he met with Cooper, there was no discussion regarding payment for services. Spencer said that he considered the proposal presented by Cooper to be "an offer to do work. . . . [I]t was a – done in an effort to secure the job." Spencer noted that he, as a lawyer, is trained to have all of his agreements in writing. Here, there was no such written agreement between the Foundation and Mill Creek. Consequently, Spencer felt that the Foundation did not agree to pay Mill Creek for its work on the Project, and that it would be unreasonable for Mill Creek to expect such payment. Spencer acknowledged that the Foundation was still considering developing the London street scene portion of what Cooper had designed.

At the conclusion of the proof, the trial court found that there was no meeting of the minds between the parties regarding a design fee, and consequently, held in favor of the Foundation on the breach of contract and promissory estoppel claims. The trial court also found that the Foundation has derived no benefit from Mill Creek's design work because it never went forward with the Project. Based on this finding, the trial court held in favor of the Foundation on Mill Creek's claim for unjust enrichment. Mill Creek now appeals the trial court's decision with respect to the unjust enrichment claim only.

Because the case was tried by the court sitting without a jury, we review the court's decision de novo, with a presumption of correctness afforded to the trial court's findings of fact. *See Schnider v. Carlisle Corp.*, 65 S.W.3d 619, 621 (Tenn. Ct. App. 2001); Tenn. R. App. P. 13(d). The trial court's conclusions of law are reviewed de novo, and are not afforded any presumption of correctness. *See State v. Levandowski*, 955 S.W.2d 603, 604 (Tenn. 1997).

Tennessee has long recognized claims based on the doctrine of unjust enrichment. This theory of recovery can also be called *quantum meruit*,[4] quasi contract, or contract implied in law. *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 154 (Tenn. 1966) (stating that "[a]ctions brought upon theories of unjust enrichment, quasi contract, contracts implied in law, and *quantum meruit* are essentially the same"); *see also River Park Hosp., Inc. v. BlueCross BlueShield of Tenn., Inc.*, No. M2001-00288-COA-R3-CV, 2002 WL 31302926, at *11 (Tenn. Ct. App. Oct. 11, 2002). "Courts frequently employ the various terminology interchangeably to describe that class of implied obligations where, on the basis of justice and equity, the law will impose a contractual relationship between the parties, regardless of their assent thereto." *Paschall's*, 407 S.W.2d at 154. "Unjust enrichment is a quasi-contractual theory under which a court may impose a contractual obligation on the parties where one does not otherwise exist." *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998). "[C]ontracts implied in law 'are created by law without the assent of the party bound, on the basis that they are dictated by reason and justice.' " *River Park Hosp.*, 2002 WL 31302926, at *11 (quoting *Angus v. City of Jackson*, 968 S.W.2d 804, 808 (Tenn. Ct. App. 1997)).

In *Paschall's*, the Tennessee Supreme Court determined that, in order to establish a claim based on quasi contract, the plaintiff must show that (1) a benefit has been conferred upon the defendant by the plaintiff; (2) the defendant appreciated the benefit; and (3) acceptance of the benefit under the circumstances would make it inequitable for the defendant to retain the benefit without paying the value of the benefit. *Paschall's*, 407 S.W.2d at 155; *Angus*, 968 S.W.2d at 808 (quoting *Paschall's*, 407 S.W.2d at 155). "The most significant requirement for a recovery on quasi contract is that the enrichment to the defendant be unjust." *Paschall's*, 407 S.W.2d at 155. Each claim of unjust enrichment must be decided according to its own factual situation. *B & L Corp. v. Thomas & Thorngren, Inc.*, 917 S.W.2d 674, 680 (Tenn. Ct. App. 1995).

---

[4]The Latin translation of this phrase means "as much as he has deserved." BLACK'S LAW DICTIONARY 1255 (7th ed. 1999).

In the instant case, the trial court dismissed Mill Creek's unjust enrichment claim based on its determination that the Foundation derived no benefit from Mill Creek's work. Mill Creek argues that the trial court's conclusion in this regard is contrary to the reasoning in *Hall & Waller & Assocs., Architects, Inc. v. Lambuth College*, No. 02A01-9109CH00196, 1992 WL 252510 (Tenn. Ct. App. Oct. 6, 1992). In *Lambuth*, the plaintiff architectural firm prepared some preliminary floor plans for a retirement home, which were done without compensation but with the express understanding that the firm would be retained for future services if the project proceeded. *Lambuth*, 1992 WL 252510, at *1. Later, the architectural firm signed a contract with the Village Corporation, a not-for-profit corporation formed by Lambuth to facilitate the project. Under this contract, the architectural firm was to furnish services for the project in return for 4% of the completed construction cost. The firm completed the plans and specifications for the retirement home, and delivered them to the Village Corporation. Later, however, the retirement home project was terminated before construction began. The architectural firm sued Lambuth on a theory of *quantum meruit* to recover payment for the work it had performed on the project.[5] The trial court held in favor of Lambuth, because there was no agency relationship between Lambuth and the Village Corporation. *Id.* at *4. On appeal, this Court held that privity between the parties was not necessary for the architectural firm to recover for unjust enrichment. *Id.* at *5. The Court also held that Lambuth was enriched by the services provided by the architectural firm because the plans and specifications "were absolutely necessary to the furtherance of [the] project," and it was anticipated that the project "would have been of great benefit to Lambuth." *Id.* at *11. Therefore, because privity was unnecessary, and because "all the requirements for recovery on quasi-contract or *quantum meruit* . . . ha[d] been established," the cause was remanded to the trial court for a determination of damages. *Id.*

Thus, in *Lambuth*, the appellate court implicitly determined that the college was enriched by the plans and specifications generated by the architectural firm, even though the project was abandoned before construction began. Like the architectural firm in *Lambuth*, Mill Creek produced the initial designs of the London street scene/science theater Project, anticipating that the Foundation would hire it to complete the designs and to participate in construction of the Project. The fact that the Foundation did not accept Mill Creek's proposal does not necessarily mean that the preliminary designs were devoid of value. The value of the designs may depend on the use to which they are put considering the fact that, at the time of trial, the Project remained on Cooper's list of job assignments. Therefore, Cooper's preliminary work did confer value to the Foundation, although that value may be less than if the Foundation had constructed the Project.

The question remains, however, whether, under these circumstances, it would be unjust for the Foundation "to retain the benefit without payment of the value thereof." *Paschall's*, 407 S.W.2d at 155. In this case, the Foundation did not solicit bids from a variety of contractors with the understanding that only the contractor selected would be compensated as part of his work on the project. The trial court, however, found that, while the Foundation did not solicit bids from other

---

[5]It could not recover from Lambuth on a breach of contract theory, because Lambuth was not a party to the contract.

contractors, it did not enter into an exclusive arrangement with Mill Creek.[6]  Indeed, it is apparent that the parties had no express agreement on any compensation for Mill Creek for the preliminary design, and there has been no appeal from the trial court's factual finding on this issue. Nevertheless, although the Foundation did not accept Mill Creek's proposal, neither did it completely reject the Project.  Rather, it is undisputed that the Foundation hired Cooper, Mill Creek's chief designer, to take the Project "in-house" so that it could reap the benefits of Mill Creek's preliminary work and decrease its costs.  Cooper, testifying on behalf of both Mill Creek and the Foundation, said that when he made his final proposal to the Foundation, Spencer and Jackson offered him a job at the Foundation to take "this whole project in-house."  Moreover, it is undisputed that the Foundation used portions of Cooper's design to construct a very small portion of the London street scene as an entrance into the science theater.  Finally, Cooper testified that the Foundation has assigned him to work on the Project at some time in the future, and at trial Spencer confirmed that the Foundation was still considering completing the London street scene .

Under these circumstances, we must conclude that it would be unjust for the Foundation to retain the benefit of Cooper's designs without paying Mill Creek the value of the benefit of the work completed by Mill Creek.  Consequently, we reverse the decision of the trial court on Mill Creek's unjust enrichment claim and remand the cause to the trial court to determine the value of the benefit of Mill Creek's work to the Foundation.

We reverse the decision of the trial court and remand for proceedings not inconsistent with this Opinion.  Costs are to be assessed to the appellee, The Jackson Foundation, Inc., for which execution may issue, if necessary.

_____
HOLLY KIRBY LILLARD, JUDGE

---

[6]Though Landers testified that he believed, through Cooper, that the Foundation hired Mill Creek to complete the designs, Cooper testified that no agreement had been reached with the Foundation that Mill Creek would be compensated for the designs if the proposal were rejected.  Therefore, it appears that the trial court credited Cooper's testimony, and the evidence does not preponderate against the trial court's conclusion that the parties did not have a meeting of the minds on this issue.